**Richard E. LOUX and Neil Conrad Wallen, Appellants,**

**v.**

**UNITED STATES of America, Appellee.**

**Vertis James BARRETT, Arthur St. Peter and Harold Oscar Thomas, Appellants,**

**v.**

**UNITED STATES of America, Appellee.**

**Nos. 21278–A, 21599–A, 21599–B, 21599–C.**

United States Court of Appeals Ninth Circuit.

Feb. 16, 1968.

No. 21278: Ralph J. Steinberg (argued for Loux), of Berns & Steinberg, San Jose, Cal., Willard F. Jones (for Wallen), Martinez, Cal., for appellants.

Carroll D. Gray (argued), Richard Wiehl, Asst. U. S. Attys., Smithmoore P. Myers, U. S. Atty., Spokane, Wash., for appellee.

No. 21599: Arthur Kurteff (argued), W. C. Bornemeier, San Jose, Cal., Carroll D. Gray, Asst. U. S. Atty. (for Barrett), James Coyle (argued for St. Peter), Los Angeles, Cal., James P. Connelly (argued, for Thomas), Spokane, Wash., for appellants.

Carroll D. Gray (argued), John McRae, Asst. U. S. Attys., Smithmoore P. Myers, U. S. Atty., Spokane, Wash., for appellee.

Before HAMLIN, JERTBERG and DUNIWAY, Circuit Judges.

DUNIWAY, Circuit Judge:

In these cases there are five appeals, arising from the convictions of the five appellants under a single indictment reading as follows:

"That on or about November 22, 1964, VERTIS JAMES BARRETT, RICHARD EUGENE LOUX, DONALD MESAROS, JOHN LOUIS MULLENIX, ARTHUR ST. PETER, HAROLD OSCAR THOMAS and NEIL CONRAD WALLEN did knowingly transport in interstate commerce from Walla Walla in the Southern Division of the Eastern District of Washington to Clackamas County, Oregon, Andrew Jackson Jeppe and Cora May Jeppe who had theretofore been unlawfully seized, kidnapped, carried away and held by VERTIS JAMES BARRETT, RICHARD EUGENE LOUX, DONALD MESAROS, JOHN LOUIS MULLENIX, ARTHUR ST. PETER, HAROLD OSCAR THOMAS and NEIL CONRAD WALLEN for ransom or reward or otherwise, in violation of Sec. 1201 Title 18 USCA."

Barrett, Loux and Wallen went to trial before a jury at Yakima, Washington on March 7, 1966. On March 9, a mistrial was ordered as to Barrett only. The trial continued as to Loux and Wallen and they were convicted and they appeal. Barrett, Thomas and St. Peter were tried before a jury at Spokane, Washington beginning on September 12, 1966. All three were convicted and they appeal.

The offense itself can be described very briefly. During the night of November 22, 1964, seven convicts, the defendants named in the indictment, escaped from the Washington State Penitentiary at Walla Walla, Washington. They kidnapped an elderly couple, Mr. and Mrs. Jeppe, seized their car, and, taking the Jeppes along, went to Oregon. Eventually, the Jeppe's car became mired in mud. The defendants abandoned the Jeppes unharmed and left in another car that they had stolen.

We consider first a problem common to all appeals, then those raised by Loux or Wallen and arising from the Yakima trial, and finally, those raised by Barrett, St. Peter, or Thomas, and arising from the Spokane trial.

1. *Were the defendants entitled to the special procedural benefits available in a capital case?*

No appellant raises this question, but the government, with commendable frankness, calls our attention to our recent decision in Amsler v. United States, 1967, 381 F.2d 37, 44–45. We there held that, under the rule in Smith v. United States, 1959, 360 U.S. 1, 79 S.Ct. 991, 3 L.Ed.2d 1041, an indictment that does not state that the victim was released unharmed charges a capital offense. That rule is applicable to the indictment in these cases. Here the rule in *Smith* that such an offense must be charged by indictment, not by information, was followed. We also held in *Amsler* that in such a case compliance with 18 U.S.C. § 3432 and with Rule 24(b), F.R.Crim.P., is mandatory, and failure to comply with

them is plain error, requiring reversal under Rule 52(b), F.R.Crim.P.[1]

These cases, however, differ from *Amsler* in important respects. In *Amsler*, "[it] was apparently conceded and understood by the court and counsel throughout the entire pre-trial proceedings that Sinatra was released unharmed. For this reason it appears that the offense was considered and tried as a non-capital offense." (381 F.2d p. 45.) Nevertheless, under the indictment the government could have introduced evidence of harm to the victim, and we felt that the tacit understanding of the parties did not change the case from capital to non-capital. In the present cases, there was the same understanding. But it was much more than tacit. Long before the first trial, on October 27, 1965, with counsel for all parties present, the following occurred:

"THE COURT: Now, do I understand, Mr. Fransen, that there is no intention on the part of the United States at this time to ask that this be considered as a capital case.

MR. FRANSEN: That is correct, your Honor.

THE COURT: And you are willing to be bound by that statement now; that is the situation?

MR. FRANSEN: There is no question in our minds as to that, your Honor.

THE COURT: So that there is no question about that, the record now shows that the United States of America agrees that they will be bound not to ask for the death penalty in this case, and will present no evidence, as I understand it, that there was any harm to the Jeppes at any time during their alleged abduction.

MR. FRANSEN: That is correct, your Honor.

THE COURT: So, that simplifies that matter, in connection with separate trials and separate defenses."

This agreement was never modified or revoked; none of the defendants' counsel objected to it. None at any time demanded the rights accorded by 18 U.S.C. § 3432 or by Rule 24(b). We think that the court's action of October 27, 1965 made it clear, on the record, that, at least from that time on, the case was not a capital case. The government was, from that time, not free to introduce evidence that the Jeppes were harmed. As we said in *Amsler*, "It is the possibility of an imposition of a death penalty under the indictment, not the evidence produced at the trial, which determines if the accused is entitled to the procedural benefits available in capital cases." 381 F.2d at 45. Here after October 27, 1965, the death penalty was impossible. The court explicitly said so, on the record; the government agreed, on the record, to be bound by what the court said. We can see no reason or policy that would be furthered by holding that under these circumstances these were still capital cases.

We also think that counsel's acquiescence in the court's ruling and the government's commitment, coupled with their failure to assert the rights accorded them by the statute and the rule, amounts to a valid waiver of those rights. In Logan v. United States, 1892, 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 429, which is relied upon in *Amsler*, the court said in reference to the parent section 3432:

"Being enacted for his [the defendant's] benefit, *he may doubtless waive it*; but he has a right to insist upon it, and, *if he seasonably does so*, the trial cannot lawfully proceed until the requirement has been complied with." P. 304, 12 S.Ct. p. 630. (Emphasis added.)

That principle, we think, applies here.

On both grounds, we hold that *Amsler* is not controlling here.

<hr>

1. In *Amsler* one defendant, Amsler, appears to have asserted his rights on appeal; the other, Irwin, did not. We applied the plain error rule to Irwin, in order to avoid the unjust result of reversing as to Amsler only. This case is not, in that respect comparable to *Amsler*.

2. *The Yakima trial.*

a. *Loux' appeal.*

■ *The grand jury testimony:*

Loux' only specification of error is that the court should have granted his motion either to require the government to produce the grand jury testimony of government witnesses or to dismiss the indictment because the grand jury testimony was not available. The testimony of the witnesses before the grand jury was not recorded. Consequently, the first alternative motion could not be granted. The second was denied.

■ The law does not require that the testimony of witnesses before a grand jury be recorded or transcribed. Rule 6 (d), F.R.Crim.P. is permissive, not mandatory. Every court that has considered the question has so held. United States v. Caruso, 2 Cir., 1966, 358 F.2d 184, 186; United States v. Cianchetti, 2 Cir., 1963, 315 F.2d 584, 591; United States v. Martel, D.C.N.Y., 1954, 17 F.R.D. 326 (cited with approval in Cianchetti, supra); United States v. Hensley, 6 Cir., 1967, 374 F.2d 341, 352; Welch v. United States, 10 Cir., 1966, 371 F.2d 287, 291. Nor is there support for the claim that failure to record grand jury testimony violates the defendants' constitutional rights. United States v. Cianchetti, supra, and United States v. Hensley, supra, are to be contrary. See also Lawn v. United States, 1958, 355 U.S. 339, 349–350, 78 S.Ct. 311, 2 L.Ed.2d 321; Costello v. United States, 1956, 350 U.S. 359, 363, 76 S.Ct. 406, 100 L.Ed. 397.[2]

■ Here the government did not have "exclusive access to a storehouse of relevant fact," as in Dennis v. United States, 1966, 384 U.S. 855, 873, 86 S.Ct. 1840, 16 L.Ed.2d 973. The storehouse was not only empty; like the snakes in Ireland, it was non-existent.

b. *Wallen's appeal.*

(1) *Sufficiency of the indictment.*

The indictment alleges that the defendants kidnapped the Jeppes and held them "for ransom or reward or otherwise." These are the exact words that are used in 18 U.S.C. § 1201(a) which defines the offense. Wallen claims that if the government is to rely on "or otherwise" it must specifically allege the reasons that come within this phrase. He says that because the indictment did not specify these reasons, the defendants could only be convicted for holding the Jeppes for ransom or reward. United States v. Varner, 7 Cir., 1961, 283 F.2d 900; United States v. Bazzell, 7 Cir., 1951, 187 F.2d 878. Kidnapping to prevent capture is not considered holding for ransom or reward. Gooch v. United States, 1936, 297 U.S. 124, 56 S.Ct. 395, 80 L.Ed. 522, and therefore, says Wallen, there is no evidence to support his conviction.

■ In this circuit the law on this point is clear. In Dawson v. United States, 9 Cir., 1961, 292 F.2d 365 we upheld an indictment that did not allege any purpose. In so doing we expressly disagreed with United States v. Varner, supra. See also United States v. Bentley, 6 Cir., 1962, 310 F.2d 685. The indictment is sufficient.

(2) *Admission of the assistant prosecutor to the bar of the Court.*

At the opening of the trial, and in the presence of the venire, the following occurred:

"MR. GRAY: [the prosecutor] It is my privilege and pleasure now to move the admission of Richard L. Wiehl, your Honor, to the bar of this court. He is from Yakima, your Honor, and he graduated in 1960 from the University of Washington Law School, he

**2.** As a former California judge, the writer feels compelled to state that, in his view, the restrictions on examining grand jury testimony and the excessive regard for the secrecy of grand jury proceedings that prevail in federal courts are quite unjustified by experience. Federal courts could profit by the California experience. See the article by Mr. Justice Draper of the California Court of Appeal, "State Experience Points Way for Improvement of Federal Criminal Procedure," 42 Cal.St. Bar Jnl. 34 (1967).

passed his bar examination and was admitted to the Washington State Bar.

He served for three years with the FBI after his graduation from law school, and after that he was an Assistant Attorney General for the State of Washington.

Recently Mr. Wiehl joined the staff of the U. S. Attorney's Office here. I am very pleased to move his admission to this court.

THE COURT: Thank you, Mr. Gray.

Mr. Wiehl, you are admitted, and we welcome you as a member of the bar here. You may now take your oath.

(Oath administered to Mr. Wiehl).

(Proceedings at the bench:)

MR. WOODALL: At this time we wish to move for a mistrial on the ground that counsel for the prosecution has now been given unusual and unnecessary publicity, being sworn in here in the presence of the prospective panel of jurors. I think such conduct on the part of counsel is deplorable. This could just as well have been done in the absence of the jury panel.

MR. TAGGART: We join in the motion, your Honor.

MR. PATRICK: Likewise, your Honor, we join in the motion.

THE COURT: The motion will be denied."

■ The point verges on the frivolous.

(3) *Limiting the number of defense witnesses.*

Wallen's defense was that he was playing basketball in the prison when the escape and kidnap took place. The court allowed five convicts from the penitentiary to be subpoenaed to testify to this alibi. The court refused Wallen's request under Rule 17(b), F.R.Crim.P. to have five additional convicts subpoenaed to testify to the same thing. It thought that their testimony would be cumulative. Up to this point in the trial the Jeppes had identified Wallen as one of the kidnappers. Five convicts had testified that he was playing basketball that night. Wallen argues that the testimony of ten convicts is necessary to overcome the testimony of two ordinary citizens. After denial of Wallen's motion and the close of his case, the government, in rebuttal, proved that the score sheet which indicated that Wallen had been playing basketball on the night of the escape had been inserted in the score book at a later time.

■ As a practical matter, the court needs the right to impose some limitation on the number of witnesses testifying about a particular fact. Decision as to how many must be left to the sound discretion of the judge. We have long applied this general principle. Hauge v. United States, 9 Cir., 1921, 276 F. 111. See also Burgman v. United States, 1951, 88 U.S.App.D.C. 184, 188 F.2d 637; United States v. Baysek, 3 Cir., 1954, 212 F. 2d 446; Feguer v. United States, 8 Cir., 1962, 302 F.2d 214. We are not convinced that the testimony of ten prisoners would have been significantly more persuasive than the testimony of five. Considering that the witnesses were all convicts endowed with little credibility, that the testimony strongly suggested that the witnesses were lying, and that the testimony would have been strictly cumulative, we cannot hold that it was an abuse of discretion to limit the number of such witnesses on this issue in this case to five.

(4) *Constitutionality of former Rule 17(b), F.R.Crim.P.*

Wallen was indigent. To obtain subpoenas for his alibi witnesses he had to comply with Rule 17(b) of the Federal Rules of Criminal Procedure as it then read. This section then provided for the free issuance of subpoenas at the request of an indigent defendant, but conditioned on the requirement that, "[t]he motion or request shall be supported by affidavit in which the defendant shall state the name and address of each witness and the testimony which he is expected by the defendant to give if subpoenaed, and shall show that the evidence of the witness is material to the defense." Wallen claims that this provision deprived him of due process because it forced him, as

an indigent defendant, to disclose in advance the theory of his defense, whereas a non-indigent defendant could have subpoenas issued in blank without any disclosure. Rule 17(a), F.R.Crim.P.

The government does not directly answer this argument. Instead, it claims that, because the witnesses were prisoners, a writ of habeas corpus ad testificandum had to issue to secure their presence. And because proceedings for such a writ would be a matter of public record, the defendant would not be prejudiced by being required to divulge the names and expected testimony of his witnesses. The short answer to this argument is that nowhere in the record does it appear that the writ of habeas corpus ad testificandum was either applied for or issued. Apparently the subpoenas were enough.

However, we do not think that the question raised by Wallen is open on this appeal. Nowhere in the record does it appear that he objected to the provisions of Rule 17(b) that he now attacks. For all we know, had he raised the point, he might have been permitted by the trial judge to obtain the subpoenas without being required to disclose the subject matter of the testimony of the witnesses, or the Judge might have ordered his affidavit, which can be presented ex parte, sealed.

■ Moreover, assuming the invalidity of the portions of the rule that are attacked,[3] we believe that the error was harmless beyond a reasonable doubt. (Chapman v. State of California, 1967, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705). Here, all that the government learned from the affidavit of Wallen's counsel was that the witnesses would testify to an alibi and that the basketball score book would be used. This did bring the book to the government's attention,

and it had the book examined by the F.B. I. It produced an expert who testified that the pertinent pages of the book were not genuine. But this could have happened in the absence of the provisions of the rule to which Wallen objects. A subpoena for the book would have had to issue under Rule 17(c), describing it. And the government could have obtained an order under that subsection, which applies equally to the rich and to the poor, that the book be produced for examination before trial. If the subpoena had been issued too late for the obtaining of such an order, we are unable to believe that the court would not have allowed the government time in which to have the book examined. No other possible prejudice to Wallen appears. It is not suggested that the government introduced, in response to the alibi, any other evidence that it would not otherwise have produced.[4] We therefore overrule the claim of error, and we do not pass upon the validity of the portions of Rule 17(b) that are attacked. They were repealed in 1966.[5]

### (5) Evidence of escape.

■ Wallen contends that the introduction of evidence of his and his co-defendants' escape from prison was error, because it was prejudicial and confusing to the jury. We find the contention wholly without merit. The general rule is that evidence of bad acts (usually crimes) is inadmissible to show the defendant's bad character or disposition to commit crimes. McCormack, Evidence, § 157. However, if the evidence is relevant for some other purpose, it is clearly admissible. Wigmore, Evidence, 3rd ed. §§ 216–18. Thus the prosecution can introduce evidence of other crimes that "tends to establish a common scheme, plan, system or design, and where it is so

---

3. The requirements were upheld in Thomas v. United States, 5 Cir., 1948, 168 F. 2d 707. However, Griffin v. People of the State of Illinois, 1956, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 and Coppedge v. United States, 1962, 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21, cast considerable doubt upon their validity.

4. What happened here served to enhance rather than to diminish the reliability of the guilt determination process. See, "Harmless Constitutional Error," 20 Stan.L.R. 83, 89 (1967).

5. See 18 U.S.C.A. Rule 17(b), Cumulative Pocket Part, notes of Advisory Committee on Rules.

related to the crime charged that it serves to establish the crime charged or to establish a motive, intent, or absence of mistake or accident as to the crime charged." Morgan v. United States, 10 Cir., 1966, 355 F.2d 43, 45. Clearly in this case the evidence of the escape tends to establish a common plan and motive for the kidnapping. Reed v. United States, 9 Cir., 1966, 364 F.2d 630. In addition it helps the jury to understand the case and tends to identify the defendants. It is immaterial that it may also show the defendant's general criminal disposition. See also United States v. Frascone, 2 Cir., 1962, 299 F.2d 824, 828.

### 3. *The Spokane Trial.*

#### a. *The use of shackles.*

This question is presented by all three appellants, Barrett, St. Peter and Thomas. Before the trial, information came to the attention of the judge indicating that the defendants might attempt to escape during the trial. He therefore held a rather extensive hearing on the question of whether the defendants should be shackled during the trial. He ultimately decided that they should, and they were. The shackles consisted of leg irons, handcuffs and a belt to which the shackles were attached by chains. The defendants could walk and move their hands, but their movements were limited. Efforts were made to make this situation as inconspicuous as possible. The defendants were brought in and seated behind a table before the jury came in. The jury did not see them escorted in or out. It was made clear that if any of the defendants desired to take the stand, the shackles would be removed, although the judge refused, for reasons of security, to state in advance just how this would be arranged.

At the hearing, it was shown that the courtroom was not as secure as most, that there was no holding cell adjacent, that the defendants and witnesses had an exceptionally high potential for escape and violence, and that some preparations for escape had been made by the defendants. The defendants' records reveal that Barrett had twice successfully escaped

from prison and had lost an arm in an unsuccessful attempt, was in jail for burglary and other offenses, and that there were indications that he had intentionally injured himself during the first trial at Yakima in an attempt either to escape or to interfere with the trial; that St. Peter had escaped from prison five times, had once shot it out with an officer, was a habitual criminal currently in prison for robbery, and was armed at the time of his arrest; that Thomas had escaped from prison three times, was twice a kidnapper, and was currently in jail for second degree murder. Several of the witnesses to be called had equally sinister records. Moreover, it was inevitable that the jury would learn at the trial that the defendants, with four others, had escaped from the maximum security portion of the state penitentiary. The jury thus was bound to know that they were dangerous men, whether shackled or not.

The court was well aware that it is prejudicial for defendants to be shackled in the courtroom. All authorities agree. See 21 Am.Jur.2d, Criminal Law, § 240, and cases cited. But it is equally well established that, when the facts warrant, it is within the discretion of the court to require that they be shackled, for the protection of everyone in the courtroom and its vicinity, ibid. Here the judge followed what is said to be the better practice, by holding a hearing on the matter and stating his reasons for the record. People v. Mendola, 1957, 2 N.Y.2d 270, 159 N.Y.S.2d 473, 140 N.E.2d 353, 356.

The appellants rely heavily on a further statement in 21 Am.Jur.2d, supra, that "in exercising its discretion the court must have some reason, based on the conduct of the prisoner at the time of the trial, to authorize so important a right to be forfeited." Also see Anno. 75 ALR (2d) 762. We do not think that this is the law. To require a dangerous act at trial before shackling the prisoner would seriously impair the court's security. The purported requirement of bad conduct at trial stems from two old

Missouri cases, State v. Kring, 1877, 64 Mo. 591 and State v. Temple, 1906, 194 Mo. 237, 92 S.W. 869. It was reiterated in dictum in Blair v. Commonwealth, 1916, 171 Ky. 319, 188 S.W. 390, which was reversed on other grounds. Modern cases do not require that the judge's decision be based on conduct of the prisoner at trial. State v. Roberts, 1965, 86 N.J. Super. 159, 206 A.2d 200, 204; Odell v. Hudspeth, 10 Cir., 1951, 189 F.2d 300, 302; Tunget v. Commonwealth, 1946, 303 Ky. 834, 198 S.W.2d 785, 786; People v. Thomas, 1965, 1 Mich.App. 118, 134 N.W.2d 352, 357. In Commonwealth v. Chase, 1966, 350 Mass. 738, 217 N.E.2d 195, 197, a weaker case for using restraints than the present one, the court said "a judge's refusal to order the removal of shackles, where there exists any reasonable basis for anticipating that a prisoner may attempt to escape, will not be overruled." Here, we need not go so far; the showing was very strong.

▉ Nor do we think that it was error for the judge to refuse to permit counsel to question the Marshal about the number and disposition of the deputies who were in the courthouse for purposes of security. Such information, as the judge pointed out, could have materially aided the defendants in attempting to escape. We think that, at least in this case, once it appeared that the defendants were likely to try to escape, the judge was not required to permit revelation of security measures that had been taken, even though such measures may have had some relevance on the issue as to whether the defendants should be shackled. It will be time enough to decide a different case when it arises.

### b. *The denial of separate trials.*

▉ St. Peter and Thomas urge that the court should have granted them separate trials, primarily upon the ground that if this had been done, there would have been no necessity that they be shackled. This, however, does not follow. Most of the problems of security would still have existed. This case, involving a single offense, jointly com-

mitted, is certainly one in which a single trial of all defendants would be proper. Rule 8(b), F.R.Crim.P. The case was divided into two trials for security reasons. The judge had discretion to go further. Rule 14, F.R.Crim.P., Fernandez v. United States, 9 Cir., 1964, 329 F.2d 899, 906; Peek v. United States, 9 Cir., 1963, 321 F.2d 934, 942–943, 5 A.L.R.2d 802; Shockley v. United States, 9 Cir., 1948, 166 F.2d 704, 709. But no case has been cited, and we know of none, that holds that his refusal to do so, in circumstances at all comparable, is an abuse of that discretion. We find no such abuse here.

### c. *Barrett's appeal.*

#### (1) *Double jeopardy.*

Barrett first went to trial with Loux and Wallen in Yakima, Washington. During a recess, after the prosecution had presented its case and while Wallen was in the process of presenting his defense, Barrett was injured in a fall on the courthouse steps. He claims that it was accidental; the prosecution intimates that it was intentional. The trial judge, on his own motion, and over the objection of Barrett's attorney, declared a mistrial as to Barrett. The two other defendants, Loux and Wallen, indicated that they would object if the trial were continued or delayed a few days. Thus the trial judge was faced with the decision either to declare a mistrial as to Barrett and continue the trial of the other two defendants over the objection of Barrett, or to declare a continuance until Barrett was able to attend the trial, over the objection of the other two defendants. At the time of the declaration of the mistrial, Barrett was in a hospital and it was unclear as to how long he would be unavailable. Barrett's attorney wanted the judge to wait until Monday (the accident occurred on Wednesday morning) to see whether Barrett could be in court, and then decide whether to declare a mistrial. The court, however, did not wait; it declared a mistrial as to Barrett on Wednesday afternoon.

The law as to the declaration of a mistrial by reason of the illness of the

defendant is stated in a Note in 159 ALR 750 at 751, as follows:

> "The rulings upon the present subject are in harmonious accord. Allowing for slight differences in the precise circumstances dealt with, and in the language used in the several opinions, the authorities are in agreement that in a criminal case the illness of the accused, arising or becoming manifest in the course of his trial, and of such a character that it reasonably appears that the accused will be for some time unable to attend or participate effectively in the trial, is a sufficient ground of necessity upon which the trial court, in its sound judicial discretion, is warranted in declaring a mistrial and discharging the jury; and that a partial trial properly so terminated because of the illness of the accused does not support a plea of former jeopardy nor operate as an acquittal."

■ No federal case dealing with the illness of a defendant has been cited to us. But the rationale of leading federal cases dealing with double jeopardy supports the view that, in this case, the court properly declared a mistrial as to Barrett and that his retrial did not subject him to prohibited double jeopardy. See United States v. Perez, 1824, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165; Wade v. Hunter, 1949, 336 U.S. 684, 690, 69 S.Ct. 834, 93 L.Ed. 974; Gori v. United States, 1961, 367 U.S. 364, 81 S.Ct. 1523, 6 L.Ed.2d 901; United States v. Tateo, 1964, 377 U.S. 463, 84 S.Ct. 1587, 12 L.Ed.2d 448; Howard v. United States, 9 Cir., 1967, 372 F.2d 294, 298; Oelke v. United States, 9 Cir., 1967, 389 F.2d 668, decided Dec. 29, 1967; United States v. Chase, 4 Cir., 1967, 372 F.2d 453, 465. The mistrial here was not caused by the government as in Downum v. United States, 1963, 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100. Here, Barrett's injury was either accidental or self-induced. In either case, it presented the same problem to the trial court, which solved it in a manner well within its discretion.

*d.  Thomas' appeal.*

*(1)  Sufficiency of the evidence.*

■ Thomas claims that he was not an intentional participant in the kidnapping, but acted under the duress of his fellow convicts. He produced some equivocal testimony to that effect from two of them. The jury did not have to believe them. And there was other evidence from which the jury could find that he was a willing and active participant. Apparently Thomas did not say much, if anything, during the kidnapping. However, he was in the back seat of the Jeppes' car and ducked out of sight whenever another car approached. At a place called Government Camp all of the convicts except Mullenix went and tried the doors and windows of a lodge. In Gresham, Oregon, five of the convicts, including Thomas, scattered out and returned in about half an hour pushing a stolen car. Because that car could not be started, the same five men later stole a station wagon. When the Jeppes' car got mired in mud all seven of the convicts attempted to push it out. After this was unsuccessful the seven convicts left together in the stolen station wagon. The issue was for the jury.

*(2)  Error in instructing the jury.*

■ Thomas claims that it was error for the court to refuse to give a requested instruction to the effect "that knowledge that a crime is being committed, even when coupled with presence at the scene, is not sufficient to constitute aiding and abetting." He bases this argument primarily on United States v. Garguilo, 2 Cir., 1962, 310 F.2d 249. That was a close case, in which there was little evidence of participation by the appealing defendant. Here the issue is much less close. In addition, in this case the judge emphasized in his charge to the jury that appellants must have participated willfully. The court also gave a proper instruction about coercion as a defense. Considering the facts of this case we believe that the instructions were sufficient to insure that the jury would not

**922**

convict Thomas merely on a finding of presence and knowledge.

> (3) *Refusal to require production of an F.B.I. report.*

Three days after his escape Thomas talked to an agent of the F.B.I. The agent made a typewritten memorandum of what he said. Both before and after the effective date of present Rule 16 of the Federal Rules of Criminal Procedure, Thomas moved for production of this memorandum. The motion was denied each time. However, some time after the defense had rested the government made copies of this memorandum available to Thomas and the court. None of the contents of the memorandum was allowed in evidence. Thomas argues that it was prejudicial error to deny his motions to produce the memorandum before trial.

 The trend of the decisions, and, we think, the better practice, is to grant such motions rather freely. Leland v. State of Oregon, 1952, 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302; Cicenia v. LaGay, 1958, 357 U.S. 504, 78 S.Ct. 1297, 2 L.Ed.2d 1523. The Supreme Court has made it clear that it favors disclosure, rather than suppression, of relevant materials. Dennis v. United States, 1966, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973. When a person is attempting to discover his own statements some of the reasons for not allowing discovery are eliminated. There is no danger to government informants; there is no fishing expedition; there is no unfairness in giving the defendant the right to discovery (a right not available to the government because of the Fifth Amendment), when the information sought to be discovered has been obtained by the government with the defendant's cooperation. See Kaufman, Criminal Discovery and Inspection of Defendant's Own Statements in the Federal Courts, 57 Colum.L.R. 1113 (1957). Nevertheless, the overwhelming authority is that a memorandum of a government agent of the defendant's statement is not producible as a matter of right under Rules 16 or 17(c). Kaufman, Criminal Discovery and Inspection of Defendant's Own State-

ments in the Federal Courts, supra, Cooper v. United States, 9 Cir., 1960, 282 F.2d 527; United States v. Murray, 2 Cir., 1962, 297 F.2d 812. The present Rule 16 explicitly states that "the court may order the attorney for the government to permit the defendant to inspect and copy or photograph any relevant (1) written or recorded statements or confessions made by the defendant, or copies thereof, within the custody or control of the government." Thus the matter is left to the discretion of the judge.

Moreover, here we can find no prejudice to Thomas. He did not prove any special circumstance which would entitle him to the memorandum. The information contained in it was never used against him. He was eventually shown the document. He did not himself use it. He did not seek to reopen for that purpose.

No other errors are asserted. Each judgment of conviction is affirmed.