UNITED STATES of America, Plaintiff-Appellee,

v.

Phillip MARTINEZ, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

Michael OLMO, Defendant-Appellant.

Nos. 75–2913, 75–2912.

United States Court of Appeals, Ninth Circuit.

June 7, 1976.

---

Robert D. Ward, Asst. U. S. Atty. (argued), San Francisco, Cal., for plaintiff-appellee.

Frank Ubhaus (argued), of Humphreys, Berger & Pitto, San Jose, Cal., for defendants-appellants.

OPINION

Before BROWNING and ELY, Circuit Judges, and EAST,* District Judge.

EAST, Senior District Judge:

The defendants-appellants Phillip Martinez (Martinez) and Michael Olmo (Olmo) each appeal from their separate judgments of conviction and sentences to life imprisonment entered by the District Court on August 7, 1975. We affirm.

Martinez and Olmo were each 17 years of age at the time they were indicted for the alleged crime of murder in the first degree in violation of 18 U.S.C. § 1111, and were tried to a jury as adults. The District

* Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation.

Court, upon entry of the verdicts of guilty, rejected the option of sentencing under the Federal Youth Corrections Act, 18 U.S.C. § 5005, *et seq.,* and entered the mandatory term of life imprisonment for each.

The crime occurred on Treasure Island, United States Naval Base, San Francisco, California, during the night of January 16, 1975. A naval police officer, John Sauer, responding to a call, found Nazario Romero lying on the Treasure Island Road. Romero had been shot in the back and was in severe pain. He was unable to control the involuntary movement of at least one of his limbs.

While awaiting the ambulance, Sauer asked Romero who shot him. Romero responded, "Like, me, like me," and when Sauer asked him if he meant Mexican-American, Romero nodded. Romero also told Sauer that the man who shot him was white, had frizzy hair, and drove a 1953, or 1954 light colored Chevrolet. Romero told Sauer that he was hitchhiking from Oakland and did not know his assailants.

Sauer communicated over the police radio Romero's description of his assailants. Officers of the California Highway Patrol observed a vehicle west bound on the San Francisco Bay Bridge, with direct entrance from the Naval Base, which fit the description broadcast and being driven by a frizzy-haired white male. The officers stopped the vehicle and arrested the driver, Olmo, and the passenger, Martinez. In the glove compartment of the vehicle, the officers found a pistol. The two suspects were transported to the Naval Base for questioning where Martinez made various incriminating statements involving himself and Olmo, and recovered a quantity of cocaine from the vehicle which he turned over to the officers.

From Sauer's discovery of Romero to his arrival at the hospital, Romero asked repeatedly whether he was going to die. Sauer did not specifically tell Romero that he would be all right, but he did assure him that help was on the way. Sauer testified that he thought Romero believed he was going to die. Sauer noted that Romero's condition deteriorated rapidly during the 40 minutes he was by his side, and by the time he reached the hospital emergency room, he was unconscious. He died within a few hours.

Martinez and Olmo were taken into federal custody and a complaint was filed before the United States Magistrate charging each with juvenile delinquency. This complaint was subsequently dismissed and Martinez and Olmo were each surrendered to the custody of the authorities in the City and County of San Francisco. A petition was filed in the appropriate juvenile court charging that Martinez and Olmo as juveniles violated § 187 of the California Penal Code in that they did kill Romero with malice aforethought.

The Juvenile Court held a hearing pursuant to Cal. Welf. and Inst'ns Code, § 707, to determine whether Martinez and Olmo were amenable to treatment as juveniles. Testimony and tangible evidence of the alleged act of delinquency were considered— not to determine guilt or innocence, but only to determine suitability for treatment as juveniles. The Juvenile Court concluded that neither defendant was amenable to treatment as a juvenile, so the matter was transferred to the San Francisco Superior Court.

Thereafter the United States Attorney filed an Information charging Martinez and Olmo with juvenile delinquency under 18 U.S.C. §§ 5031 and 5032 based on a charge of first degree murder against both defendants in violation of 18 U.S.C. § 1111. A certification pursuant to 18 U.S.C. § 5032 was filed certifying that the appropriate juvenile court of the State of California, City and County of San Francisco, had refused to accept jurisdiction over the two defendants.

On March 26, 1975, the Government moved the transfer of the State Court proceedings under the Juvenile Justice and Delinquency Prevention Act of 1974, 18 U.S.C. § 5031, *et seq.,* to an adult criminal prosecution.

Following a hearing, the District Court on April 23, 1975 entered an order granting

the requested transfer and providing for the prosecution of both Martinez and Olmo as adults. On May 1, 1975, an indictment was returned in the District Court by the Grand Jury charging Martinez and Olmo with murder in the first degree in violation of 18 U.S.C. § 1111.

Following arraignment upon the indictment, Martinez and Olmo requested that they each be granted 20 peremptory jury challenges pursuant to Fed.R.Crim.P. 24(b), that an additional attorney be provided and a witness and a venireman list. The District Court granted the requests for one additional attorney and for witness and venireman lists, but denied the request for 20 peremptory challenges.

It was stipulated by counsel that the death penalty would not be imposed in the event of a conviction and the Court so informed the jury.

At trial, the District Court admitted Sauer's testimony of Romero's description of the assailants as the dying declaration of Romero. Evidence was received that the bullet from Romero's body matched bullets from the gun taken from the glove compartment.

A brother-in-law of Martinez testified that Romero had "burned" Martinez and Olmo a week before the death and that Martinez and Olmo had discussed "ripping off" Romero; that a few days preceding the shooting Martinez had a gun in his possession and had shown a bullet to the brother-in-law with the name "Nazario" scratched in the head. Martinez and Olmo testified and admitted they had known Romero previously and that he had sold them cocaine. Martinez said Romero had "burned" them in a sale of cocaine the week before; that they met Romero on the date of the murder to obtain more cocaine, an argument ensued as to paying for it, and Olmo blamed the shooting on Martinez.

The pertinent issues on review are:

(1) Did the District Court commit reversible error by admitting the statements of Romero describing his assailants as a dying declaration exception to the hearsay rule?

(2) Did the District Court commit reversible error by denying Martinez and Olmo's request for 20 peremptory jury challenges?

(3) Was the prosecution of Martinez and Olmo in the District Court barred (a) because the United States Attorney failed to comply with the certification requirements of 18 U.S.C. § 5032, and (b) because of the jeopardy provision of the statute or the Double Jeopardy Clause of the Fifth Amendment?

*Issue 1:*

Martinez and Olmo challenge Romero's statements as dying declarations because Romero did not know that death was near and certain and had not lost all hope of recovery, as required under the test of *Shepard v. United States,* 290 U.S. 96, 54 S.Ct. 22, 78 L.Ed. 196 (1933). Additionally they assert that because several of the statements were shown to be untrue, they undercut the reliability foundation of the dying declaration exception. Further, they argue the statements would not qualify as spontaneous statements because they were shown to be partially untrue—showing the victim had the chance to reflect and fabricate—and they were made in response to Sauer's questions.

We are mindful that the District Court's discretionary admission in evidence of a decedent's statements and descriptions of his assailant as a dying declaration exception to the hearsay rule should be reversed only if determined to be clearly erroneous. *United States v. Glenn,* 154 U.S. App.D.C. 61, 473 F.2d 191 (1972). However, we do not reach that issue as we are satisfied that even if the admission of Romero's descriptions of the assailants was error, such was harmless and not prejudicial to either Martinez or Olmo. The independent evidence of Martinez' and Olmo's guilt was manifest and overwhelming. *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); and *United States v. Mobley,* 421 F.2d 345, 348 (5th Cir. 1970).

*Issue 2:*

Martinez and Olmo contend that the death penalty was a potential sentence under § 1111 at the time of their trial, and accordingly under the authority of *Amsler v. United States,* 381 F.2d 37 (9th Cir. 1967), it was plain error for the District Court to deny each of them 20 peremptory jury challenges pursuant to Rule 24(b). Their reliance upon the rational of *Amsler* is misplaced since they were not facing the possibility of a death penalty sentence in their jury trial. We are satisfied that the rationale of *Loux v. United States,* 389 F.2d 911, 915 (9th Cir. 1968), *cert. denied,* 393 U.S. 867, 89 S.Ct. 151, 21 L.Ed.2d 135 (1968), dictates rejection of the contention. *Loux* distinguishes *Amsler* on the thesis that Amsler had no actual existing agreement on the part of the Government which foreclosed the Government from seeking a death penalty. In *Loux,* the Government agreed on the record not to seek the death penalty and the District Court made it clear on the record that the case was not a capital case. This court held that under such circumstances, a death penalty was impossible and concluded:

> "We can see no reason or policy that would be furthered by holding that under these circumstances these [*Loux*] were still capital cases."

█ So it is in this case. A stipulation and order was filed four days before trial stating that "the provisions of 18 U.S.C. § 1111 relating to the death penalty shall not be imposed," and the District Court so advised the jury. Thus, under the rationale of *Loux,* the proceedings in the District Court were no longer capital cases requiring compliance with the 20 peremptory challenge provisions of Rule 24(b).

█ The granting by the District Court of the request for two attorneys pursuant to 18 U.S.C. § 3005 under the rationale of *United States v. Watson,* 496 F.2d 1125 (4th Cir. 1973), is not inconsistent with the denial of the request for 20 peremptory jury challenges under Rule 24(b). *United States v. Freeman,* 380 F.Supp. 1004 (D.N.D.1974).

*Issue 3(a):*

█ We reject Martinez and Olmo's contention that the United States Attorney's certificate under § 5032 must certify, in addition to the posture of the State Juvenile Court, that no other appropriate state court would accept jurisdiction for the prosecution of Martinez and Olmo *as adults.* The express language of § 5032 does not require such a statement or certificate nor does any rational reading of the language inferentially require such a statement or certificate.

*Issue 3(b):*

. █ Martinez and Olmo contend that the State Juvenile Court § 707 "transfer hearing" during which evidence was heard regarding the facts of the crime and the arrest, qualifies as a "proceeding [that] has reached the stage that evidence has begun to be taken with respect to a crime." Therefore, they assert that § 5032[1] was violated when they were tried by the federal government, and they were subjected to double jeopardy because the statute has abolished the dual sovereignty doctrine in juvenile cases. Furthermore, they contend that the State Juvenile Court § 707 hearing constituted double jeopardy under the Fifth Amendment as determined by the Supreme Court in *Breed v. Jones,* 421 U.S. 519, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975).

We reject both contentions. In *Breed,* the juvenile, Jones, was subjected to a state juvenile court prosecution for the alleged act of delinquency under Cal.Welf. and Inst'ns Code, § 701. After determining that Jones committed the act charged, he was transferred pursuant to § 707 to the Superior Court of California for trial as an adult for the same crime. The Supreme

1. Section 5032 provides, *inter alia:*
   "Once a juvenile has entered a plea of guilty or the proceeding has reached the stage that evidence has begun to be taken with respect to a crime or an alleged act of juvenile delinquency subsequent criminal prosecution or juvenile proceedings based upon such alleged act of delinquency shall be barred."

Court held that the prior "adjudicatory hearing" held by the State Juvenile Court placed Jones in jeopardy. The subsequent transfer efforts and adult prosecution attempt were condemned as violative of the Double Jeopardy Clause.

In this case, the reverse procedure was utilized. The State Juvenile Court conducted a "transfer hearing" on the amenability of Martinez and Olmo to juvenile treatment pursuant to § 707. After determining their non-amenability to treatment under the juvenile procedures, they were transferred to adult court. The record before us does not reveal any adjudicatory consideration nor determination of guilt or innocence by either the State Juvenile Court under the § 707 transfer proceedings or the District Court under the § 5032 transfer hearing procedure.

The express language of § 5032 authorizes the taking and consideration of evidence of the nature of the alleged crime or act of delinquency in determining the advisability of a transfer to an appropriate court for trial as adults. It is manifest that the quoted language of § 5032 is geared only to prior adjudicatory hearings where guilt or innocence of the alleged crime or act of delinquency is at issue.

We are satisfied that the § 707 "transfer hearing" procedure followed by the State Juvenile Court in this case is sanctioned by *Breed*, 421 U.S. at pages 535–40, 95 S.Ct. 1779, and did not impose jeopardy.

We do not reach the contention of Martinez and Olmo that § 5032 abolishes the state-federal sovereignty doctrine.

The several judgments of conviction and sentences to life imprisonment are each affirmed.

AFFIRMED.