**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Peter Gaston KAISER, Defendant-Appellant.**

No. 74–4128.

United States Court of Appeals, Fifth Circuit.

Jan. 14, 1977.

Thomas R. Bryan, Jr., Columbus, Ga., (Court appointed), for defendant-appellant.

Ronald T. Knight, U. S. Atty., C. Nathan Davis, Asst. U. S. Atty., Macon, Ga., for plaintiff-appellee.

Before CLARK, Associate Justice,* and GOLDBERG and AINSWORTH, Circuit Judges.

GOLDBERG, Circuit Judge.

Peter Gaston Kaiser appeals from his conviction of first degree murder within the special territorial jurisdiction of the United States, 18 U.S.C. § 1111 (1970), and the ensuing sentence of death by electrocution. His appeal causes us to address the survival of the executioner's trade in the federal enclave after its demise in many states at Supreme Court order. Although that Court has set up some vital signs for the death penalty, none of them appear in § 1111. The capital punishment provision before us is absolutely barren of sentencing standards, an open invitation to capricious and arbitrary execution. We have no doubt that the Constitution has dealt this statute a lethal blow. Hence we reverse the judgment below insofar as it imposes a sentence of death. Finding appellant's other asserted points of error without merit, however, we affirm the judgment of conviction and remand for substitution of a sentence of life imprisonment.

The facts here require only brief statement. On August 28, 1973, two hitchhikers directed their driver to an area on the Fort Benning, Georgia, military reservation where they fatally shot him and stole his personal effects and his car. Little over a week later, appellant and his codefendant, Larry Fate Fortune, kidnapped James Hoover of Columbus, Georgia and forced him to drive them to Texas in Hoover's car. Police in Colorado City, Texas, stopped that car, with Kaiser and Fortune in the front seat, for traffic violations. The roadside detention produced the murder victim's driver's license and two pistols that Kaiser and Fortune had purchased near the date of the shooting, pistols subsequently identified as possibly having fired the bullets taken from the victim's body.

At Kaiser's trial in the United States District Court for the Middle District of Georgia, numerous witnesses related admissions made to them by Kaiser. These admissions plus an abundance of circumstantial evidence linked Kaiser and codefendant Fortune to the shooting. After one day of trial, Fortune pleaded guilty to second degree murder; he subsequently testified on Kaiser's behalf. A jury found Kaiser guilty of first degree murder, and the court imposed the sentence of death under 18 U.S.C. § 1111.

* Of the Supreme Court of the United States (Retired), sitting by designation.

We turn first to the constitutionality of that sentence. Consideration of Kaiser's other claims of error follows.

## I. Capital Punishment under 18 U.S.C. § 1111.

 The court convicted Kaiser of first degree murder within the special territorial jurisdiction of the United States, codified at 18 U.S.C. § 1111. Subsection (b) of the statute prescribes the punishment as follows:

> Whoever is guilty of murder in the first degree, shall suffer death unless the jury qualifies its verdict by adding thereto "without capital punishment", in which event he shall be sentenced to imprisonment for life . . . .

This provision is cut from the same die as that condemned as cruel and unusual in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).[1] Prior to the case at hand, the unbroken assumption of prosecutors and courts has been that the death penalty could no longer be applied under § 1111 consistently with the eighth amendment. The Supreme Court's most recent struggle with the executioner, for all its attendant confusion, bore out this assumption which was ignored by the court below. The Court's five death penalty decisions confirmed the principle that a system of capital punishment that does not clearly define standards to guide the exercise of sentencing discretion is constitutionally intolerable. This statute fully violates that principle; the sentence of death by electrocution shall be set aside.

### A. *Furman*

In the three cases consolidated under the name of *Furman, supra,* the court issued a terse *per curiam* announcement, accompanied by five individual, quite disparate concurrences, to the effect that capital punishment as imposed under statutes that provided complete discretion to the sentencing authority constituted cruel and unusual punishment.[2] Justices Brennan and Marshall concluded that the death penalty could never be constitutionally imposed. *See Furman, supra,* 92 S.Ct. at 2736 (Brennan, J., concurring); *id.* at 2765 (Marshall, J., concurring). Justices Douglas, Stewart, and White concurred on the more narrow ground that the arbitrariness, if not discrimination, that they perceived in the operation of the discretionary capital punishment systems before the Court violated eighth amendment strictures. *See Furman, supra,* 92 S.Ct. at 2727 (Douglas, J., concurring); *id.* at 2760 (Stewart, J., concurring); *id.* at 2763 (White, J., concurring).

### B. Responses: § 1111 Considered

While the precise rationales for the various *Furman* opinions were most unclear, the practical impact was not. The decisions invalidated the capital punishment laws of thirty-nine states and the District of Columbia. *See Furman, supra,* 92 S.Ct. at 2815 (Blackmun, J., dissenting).[3] Most important for purposes of this appeal, Justice

---

1. *See* Ga.Code Ann. § 26–1005 (Supp.1971): The punishment for persons convicted of murder shall be death, but may be confinement in the penitentiary for life in the following cases: If the jury trying the case shall so recommend, or if the conviction is founded solely on circumstantial testimony, the presiding judge may sentence to confinement in the penitentiary for life. In the former case it is not discretionary with the judge; in the latter it is. . . . .

 Whenever a jury, in a capital case of homicide, shall find a verdict of guilty, with a recommendation of mercy, instead of a recommendation of imprisonment for life, . . such verdict shall be held to mean imprisonment for life.

2. The eighth amendment's cruel and unusual punishment clause is made applicable to the states through the fourteenth amendment. *See Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). *But see Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 2993, 49 L.Ed.2d 944 (1976) (Rehnquist, J., dissenting).

3. States wishing to maintain capital punishment understood that *Furman* called for significant redrafting. Some responded by making the death penalty mandatory for narrow categories of murder, such as felony murder or murder of a law enforcement officer. Others made the penalty available for a larger class of crimes, but attempted to define aggravating and mitigating circumstances that would guide the sentencing authority's decision whether to

Blackmun's dissent in *Furman* acknowledged that "all those provisions of the federal statutory structure that permit the death penalty apparently are voided." *Furman, supra,* 92 S.Ct. at 2815.[4] Until the case before us arose, the unanimous post-*Furman* understanding of federal courts, federal prosecutors, and Congress appears to have been that the death penalty could not constitutionally be imposed under § 1111.

Federal courts have been confronted tangentially with the death penalty provisions of § 1111 and other federal criminal statutes; all have concluded that the conferral of unfettered discretion on the sentencing authority under these provisions rendered them unconstitutional in light of *Furman.* In *United States v. Watson,* 496 F.2d 1125 (4th Cir. 1973), a § 1111 defendant complained that he had been entitled at trial to the appointment of two attorneys which 18 U.S.C. § 3005 provides for a defendant in a *capital* case. The Fourth Circuit accepted the *government's* argument that *Furman* had invalidated the death provision of § 1111:

> Since the penalty provision of § 1111 is indistinguishable from those challenged in *Furman,* it is clear that, had the death penalty been imposed on defendant, such a sentence would have been void.

496 F.2d at 1126.[5] *See also United States v. Woods,* 484 F.2d 127, 138 (4th Cir. 1973) (only available punishment under § 1111 after *Furman* is life imprisonment); *United States v. Freeman,* 380 F.Supp. 1004 (D.N. D.1974) (death penalty provision of § 1111 unconstitutional; procedural safeguards attendant upon capital charges inapplicable).

Other federal statutes conferring discretion on judge and jury to choose between imprisonment and death have fared no better. *See United States v. Quinones,* 353

F.Supp. 1325 (D.P.R.1973) (rape: 18 U.S.C. § 2031); *United States v. Bohle,* 346 F.Supp. 577 (N.D.N.Y.1972) (former federal air piracy statute).

Federal prosecutors have also recognized readily the invalidity of the capital punishment provision of § 1111. A Congressional committee considering post-*Furman* federal death penalty legislation observed that federal attorneys had ceased asking for the death penalty generally. *See* 1974 U.S. Code Congressional and Administrative News 3980. We have found no reported case since *Furman* in which a United States Attorney sought the death penalty in a prosecution for first degree murder under this statute. On the contrary, in *United States v. Watson, supra,* 496 F.2d at 1126, n. 3, the government conceded that any death penalty imposed under § 1111 would be void.

Finally, the legislative history of the Antihijacking Act of 1974 reveals Congress' understanding that *Furman* had invalidated the various discretionary death penalty provisions of the federal criminal code, including specifically that of § 1111. *See* 1974 U.S.Code Congressional and Administrative News 3980. The Congress attempted to meet the demands of *Furman* in the Antihijacking Act, *see* 49 U.S.C. § 1473(c), but made no similar effort to oxygenate § 1111. In sum, all parts of the federal machinery that have brushed against § 1111 since *Furman* have concluded that the statute fell squarely within the area condemned by that decision. The contrary assertion of the provision's continuing vitality borders on the audacious.

### C. 1976 Death Penalty Cases: *Furman* Reaffirmed

While the post-*Furman* consensus regarding the invalidity of the death penalty pro-

---

impose death in a particular case. Other approaches were also taken. *See generally,* Note, Discretion and the Constitutionality of the New Death Penalty Statutes, 87 Harv.L.Rev. 1690 (1974).

**4.** Although Justice Blackmun did not specifically list § 1111 among the condemned provisions,

he did list numerous others from which we find § 1111 indistinguishable.

**5.** The court went on to rule that, although the death penalty was unavailable, § 1111 remained a "capital crime" for purposes of the special procedural protections of 18 U.S.C. § 3005.

vision of § 1111 was compelling, caution and deference required us to await the results of the Supreme Court's further consideration of capital punishment, a subject that unforseeable delay caused to remain pending in the Court from the time of oral argument in the instant appeal to the close of the most recent term of the Supreme Court.[6] At that time an again fragmented Court gave plenary consideration to the capital punishment statutes passed by five states in response to *Furman. See Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *Roberts v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976).

The interplay of opinions and rationales leading the Court to uphold three of those statutes and void two is complex if not confounding; we do not here attempt a definitive exegesis. Such exhaustive treatment is unnecessary, for the 1976 opinions, in particular those of the pivotal plurality,[7] do easily vindicate the post-*Furman* assumptions regarding the unconstitutionality of statutes such as § 1111 and mandate our decision to make that unconstitutionality explicit. With the exception of a single Justice, the Court recognized the continuing validity and vitality of *Furman.* More fundamentally, the plurality opinions, read in conjunction with the concurrences of Justices Brennan and Marshall, yield principles

of eighth amendment review that condemn § 1111, thus eliminating the need to rest our decision solely on the similarity between the provision before us and the statutes condemned in 1972. When that combined authority is considered, there can be no doubt that a majority of the Supreme Court, no matter how they attained their alliance, would strike § 1111 as being within *Furman's* pall.

■ First, the 1976 cases do demonstrate at least an acquiescence in the *Furman* holding from almost all quarters of the Court. The plurality commenced its discussion of *Furman* in the most comprehensive of its five opinions, *Gregg, supra,* 96 S.Ct. at 2932, with this observation:

Because of the uniqueness of the death penalty, *Furman* held that it could not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner.

In conclusion of that discussion, the plurality announced that

we adhere to *Furman's* determination that where the ultimate punishment of death is at issue a system of standardless jury discretion violates the Eighth and Fourteenth Amendments.

*Id.* at 2936, n.47. More equivocally, Justice White, speaking for Chief Justice Burger, Justice Rehnquist, and himself, characterized the 1972 decision:

In *Furman,* this Court's judgment operated to preclude the practice of giving the sentencer unguided discretion to im-

6. *Fowler v. North Carolina,* —— U.S. ——, 96 S.Ct. 3212, 49 L.Ed.2d 1212 (1976), placed the death penalty before the Court at the time of oral argument in the instant appeal. The illness of Mr. Justice Douglas caused that case to be set for reargument. *See Fowler v. North Carolina,* 422 U.S. 1039, 95 S.Ct. 2652, 45 L.Ed.2d 691 (1975). The case received summary disposition in connection with the Court's decisions on capital punishment in June 1976.

7. Justices Stewart, Powell, and Stevens joined in an opinion in each of the five cases announcing the decision of the Court. Given the continuing conclusions of Justices Marshall and

Brennan that the death penalty is unconstitutional per se, this plurality supplied the critical votes to strike the statutes of North Carolina and Louisiana. *See Woodson, supra,* 96 S.Ct. at 2981; *Roberts, supra,* 96 S.Ct. at 3003. Because the greater scrutiny that Justices Marshall and Brennan find com̲ lled by the eighth amendment, both in general ̭nd as applied to capital punishment, would lead them to invalidate any penal sanction which the plurality's approach would condemn, the positions of the plurality may be read as those of a majority of the court.

pose or not to impose the death penalty for murder . . . .

*Id.* at 2947.[8]

Although less conclusively, the opinions also demonstrate that *Furman* was neither founded on nor limited to cases containing empirical evidence of arbitrariness, discrimination, or infrequency in the imposition of the death penalty.[9] Rather, the recent cases reveal majority support for the conclusion that *Furman* was grounded upon "the potential for arbitrariness inherent in granting sentencers uncontrolled discretion in deciding when to impose capital punishment." Note, Discretion and the Constitutionality of the New Death Penalty Statutes, 87 Harv.L.Rev. 1690, 1692 (1974).

Evidence of this conclusion runs throughout the plurality opinions. In the above-quoted passage from Justice Stewart's opinion in *Gregg, supra,* 96 S.Ct. at 2932, he specified that *Furman* condemned statutes creating a "substantial risk" of arbitrary and capricious capital punishment. Writing again for the plurality in *Woodson, supra,* 96 S.Ct. at 2990, Justice Stewart reiterated that the existence of unbridled discretion in a death penalty scheme was intolerable, without intimating that any showing of actual arbitrariness was required:

> Central to the limited holding in *Furman* was the conviction that the vesting of standardless sentencing power in the jury violated the Eighth and Fourteenth Amendments.

Similarly, in *Roberts, supra,* Justice Stevens's critical plurality opinion condemned the Louisiana mandatory death sentence statute without any consideration of the actual results of sentencing under the new provision, because it failed

> to comply with *Furman's* requirement that standardless jury discretion be replaced by procedures that safeguard against the arbitrary and capricious imposition of death sentences.

*Id.* at 3007.[10] Finally, the plurality in *Gregg* recognized that the *Furman* conclusion that untrammeled discretion to impose the death penalty violated the eighth amendment was in "substantial tension" with the holding in *McGautha v. California,* 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971). The Court in *McGautha* had found that standardless jury discretion in capital sentencing did not violate the due process clause of the fourteenth amendment. Nonetheless, the plurality announced adherence to its reading of *Furman. See Gregg, supra,* 96 S.Ct. at 2936, n.47.

■ The plurality also attempted to settle the standards which are to guide judicial review of a penalty under the cruel and unusual punishments clause. The constitutional prohibition comprehends contemporary public standards of decency, *see Gregg, supra,* 96 S.Ct. at 2925, which may be reflected in the actions of legislatures and juries as well as in the society's history and traditions. *Id.* at 2928–29. The eighth amendment, however, also incorporates a

---

**8.** Given their view that the death penalty is unconstitutional per se, Justices Brennan and Marshall also accept the more limited holding of *Furman.* Justice Rehnquist, however, continues to be of the view that *Furman* violated both precedent and principle. *See Woodson, supra,* 96 S.Ct. at 2998 (Rehnquist, J., dissenting).

**9.** One observer has argued that the scant documentation in some of the *Furman* concurrences militates for interpreting the Court's decision as not resting on empirical demonstration. *See* Note, *supra* note 3, at 1694–96.

If it were necessary to look beyond a statute to see if the sentencer's discretion received guidance, an inquiry we think unnecessary, one would look no further than the explicit instruction to the jury below that there were no stan-

dards to guide the choice between life and death.

**10.** Justice White's opinion for the four dissenters in *Roberts, supra,* 96 S.Ct. at 3012–13, recognized that

> [i]t is undeniable that the unfettered discretion of the jury to save the defendant from death was a major contributing factor in the developments which led us to invalidate the death penalty in *Furman v. Georgia.*

His opinions throughout the five cases, however, evidence a belief that invalidation of capital punishment provisions would follow only upon an empirical demonstration of some significant probability of arbitrary, discriminatory, or rare application of the ultimate sanction. *See, e. g., Gregg, supra,* 96 S.Ct. at 2948.

standard of human dignity not subject to majoritarian whim. *See id.* at 2925. That standard prohibits the unnecessary and wanton infliction of pain, as well as gross disproportion between punishment and crime. Id. While the plurality clearly rejected a "least restrictive alternative" analysis, its notion of unnecessary severity definitely embraced the principle that any punishment must demonstrably serve *some* valid penological justification in order to withstand constitutional scrutiny. *See id.* at 2929–30.

In light of this statement of general eighth amendment principles the reaffirmation of *Furman* may be read as a determination that standardless discretion in the imposition of the death penalty constitutes, in the terms of Justice White's concurrence in the 1972 decision,

> the pointless and needless extinction of life with only marginal contributions to any discernible social or public purposes.

92 S.Ct. at 2764.[11] The route is murky from these standards to the Court's ultimate conclusion that the prohibition against cruel and unusual punishment, far from requiring the elimination of discretion in capital punishment laws, is in fact satisfied only by the presence of some guided discretion. Moreover, the Court's application of that conclusion to the statutes before it raises many questions. Nevertheless, the Constitution's disapproval of standardless discretion in the imposition of the death penalty emerges untainted.

In 1971 the Supreme Court found ample reason to reject a due process challenge to unfettered jury discretion in the imposition of capital punishment:

> To identify before the fact those characteristics of criminal homicides and their perpetrators which call for the death penalty, and to express these characteristics in language which can be fairly under-

stood and applied by the sentencing authority, appear to be tasks which are beyond present human ability.

*McGautha, supra,* 91 S.Ct. at 1466. In 1972 *Furman* condemned under the eighth amendment discretionary capital punishment schemes identical to the one before us. In 1976 the Court perceived that those statutes had been intolerable not because they granted discretion, but because they failed to guide it. Whether the results are labeled vacillation or refinement, the tortures of the Court's most solemn and deliberate struggle with the subject may suggest the limits of human wisdom when faced with the task of justifying systems for the extinction of fellow human beings. The true course of wisdom may lie in recognizing those mortal limits and abandoning the hangman's trade; the Supreme Court has emphatically reminded us that wisdom is not a standard for application by the judiciary, but by the legislature.

■ Even this self-imposed restricted perspective has not obscured the Court's earlier insight: the imposition of capital punishment even for narrow categories of murder, absent clearly defined channels of sentencing discretion focusing on the particularized circumstances of the crime and the offender, violates both the contemporary index of decency and, serving no demonstrable penological purpose, the transcendent standard of human dignity that inhere in the proscription of cruel and unusual punishment. The anachronism before us, conferring absolute sentencing discretion, easily falls before both of those still vital standards. In this instance at least, the Constitution prohibits society from adding another barbarous, degrading act to the horrible deed of which the defendant before us stands convicted. The death penalty provision of 18 U.S.C. § 1111 being void, we must vacate the judgment below to allow

---

11. While the plurality stated its eighth amendment principles as general propositions for the judicial review of punishments, it did stress that its conclusion that the amendment requires guidance in the exercise of discretion to impose the death penalty rested on the unique nature of that sanction. *See Gregg, supra,* 96 S.Ct. at 2932. The plurality's conclusion that the eighth amendment requires particularized consideration by the sentencer of the individual offender and his offense rested clearly on the unique nature of capital punishment. *See Woodson, supra,* 96 S.Ct. at 2991–92.

substitution of the alternative punishment under the statute, life imprisonment.

## II. Trial Errors

Kaiser advances five separate claims of error and seeks reversal of the conviction on each. We find each ultimately wide of the mark.

### A. Witness List

■ Appellant first complains of the testimony of a prosecution witness whose name had not been furnished to Kaiser prior to trial as required in capital cases by 18 U.S.C. § 3432.

When the doctor who performed the autopsy of the victim identified four bullets he had removed, the defense objected to admission of the bullets into evidence. Although the doctor had independently identified the bullets, the government offered to prove the chain of custody. The court left the decision to the prosecution without ruling, and the government set out to prove the chain as a precautionary measure. Included in the chain was Leslie Denk, an official who had custody of the exhibits for one day.

Denk's name did not appear on the witness list which 18 U.S.C. § 3432 requires the prosecution to furnish in capital cases. In view of our decisions that the capital punishment provision of 18 U.S.C. § 1111 is unconstitutional and void, however, the strict procedural guarantees of § 3432 were not properly applicable to this trial. In *United States v. Hoyt,* 451 F.2d 570 (5th Cir. 1971), we confronted a similar § 3432 claim in connection with the federal kidnapping statute. The Supreme Court had held that the capital punishment provision of the statute unconstitutionally burdened the right to a jury trial. *See United States v. Jackson,* 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968). On that basis this court concluded in *Hoyt* that federal kidnapping was no longer a capital offense triggering

§ 3432. We have found no compelling distinction between the instant issue and that in *Hoyt.* As in that case, judicial excision of the death penalty provision renders § 1111 non-capital for all purposes. *See also Carter v. United States,* 388 F.Supp. 1334 (W.D.Pa.1975) (same result as *Hoyt*); *United States v. Freeman,* 380 F.Supp. 1004 (D.N.D.1974) (extra peremptory challenges under 18 U.S.C. § 3432 unavailable in § 1111 prosecution after *Furman* ). *But see United States v. Watson,* 496 F.2d 1125 (4th Cir. 1973) (18 U.S.C. § 1111 still defines a "capital crime" although *Furman* invalidates the sentencing provision; defendant's right to two attorneys under 18 U.S.C. § 3005 survives). Because 18 U.S.C. § 3432 did not apply to Kaiser's prosecution, the failure to list Denk as a witness provided no basis for objecting to his testimony.

### B. Kidnap Testimony

■■ Another prosecution witness was Mr. Hoover, the Columbus resident kidnapped by Kaiser and Fortune. Hoover testified of admissions relevant to the murder charge made by Kaiser during the trip to Texas following the kidnapping. In answer to preliminary questions regarding how he had come into contact with appellant, Hoover disclosed the kidnapping and some of the surrounding circumstances. Appellant complains that Hoover's testimony about the fact and circumstances of the kidnapping constituted evidence of other crimes serving only to impugn Kaiser's character.[12]

Appellant cannot and does not complain that Hoover's recollections of Kaiser's statement that he had killed three men and was on the run from the FBI were not properly admitted. Some predicate testimony of Hoover's association with Kaiser was necessary to establish that the witness had actually been in a position to be addressed by Kaiser and to enable the jury to make any intelligent judgment regarding Hoover's

---

**12.** Counsel for both Kaiser and Fortune offered pretrial motions and trial objections, on a variety of grounds, regarding Hoover's testimony as a whole and in certain specifics. The record is confused as to whether Kaiser's counsel, rather than Fortune's, properly preserved this specific objection. In any case, we conclude that the claim fails on its merits.

story. That predicate necessarily included at least the bare fact of the kidnapping. *Cf. United States v. Bloom,* 538 F.2d 704 (5th Cir. 1976).

Admitting evidence of other crimes for any reason, however, is proper only if genuine need for that evidence, in light of the contested issues and other evidence available to the prosecution, outweighs the danger that the jury will be inclined to convict because the other crimes show a defendant to be a "bad person." *See United States v. Miller,* 500 F.2d 751 (5th Cir. 1974), *reversed on other grounds,* 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976); *United States v. Goodwin,* 492 F.2d 1141 (5th Cir. 1974). While we insist on careful application of that balance because of the inevitably great danger for prejudice, we cannot find fault with admitting the fact of the kidnapping here. That fact was the bare minimum necessary to establish Hoover's opportunity to hear Kaiser's admissions, which were themselves important, relevant evidence. No alternative setting for Hoover's testimony existed.

The court did permit Hoover to go into greater detail regarding the circumstances of the kidnapping than was necessary to make his testimony to Kaiser's admissions comprehensible to the jury. Nonetheless we are unable to find any harm flowing from the improper failure to limit the predicate testimony more narrowly. The details of the kidnapping reflected no greater force or depravity than would ordinarily be comprehended by the mere fact of kidnapping. Given the highly incriminating nature of the admissions themselves and the abundance of evidence implicating Kaiser in the murder, we can find no possible prejudice from the failure to exclude those details.

### C. Photographs of Victim

Appellant also complains of the trial court's decision allowing the jury to view photographs of the victim as left at the scene of the murder and at the morgue. These black and white photographs, used to demonstrate the identity of the victim and the manner of death, the latter bearing on the issue of intent, had probative value. *See United States v. Delay,* 500 F.2d 1360 (8th Cir. 1974); *Maxwell v. United States,* 368 F.2d 735 (9th Cir. 1966); *cf. United States v. Hurt,* 155 U.S.App.D.C. 217, 476 F.2d 1164 (1973). Consequently the determination of admissibility required a balancing of probative value against prejudicial impact, reviewable in this court for abuse of discretion. *See United States v. Bailey,* 537 F.2d 845 (5th Cir. 1976); *United States v. Moton,* 493 F.2d 30 (5th Cir. 1974). We have viewed the photographs and, although they are upsetting, we cannot say that they are in any respect more gruesome or shocking than is inherent in any visual record of a murder. Because they were important in establishing elements of the offense, we cannot conclude that the admission of such photographs constituted an abuse of discretion, at least where no less prejudicial alternative evidence was available.

### D. Motion to Suppress

The Texas roadside detention of the car occupied by Kaiser and Fortune resulted in the discovery and seizure of the murder victim's driver's license and two pistols. The pistols had been purchased shortly before the murder and, according to expert testimony, possibly had been employed in the shooting. Appellant moved unsuccessfully to suppress this evidence as obtained in violation of his fourth amendment rights.

Two police officers testified to independent observation of traffic violations prior to stopping the car. The officer who approached the driver's side testified that Fortune handed him, apparently inadvertently, the license that later proved to belong to the murder victim. The other policeman testified that, on approaching the passenger's side, the two distinctive pistol handles were plainly visible in the seat next to Kaiser.

Appellant contradicted the officers' story below. This suppression motion thus hinged on a credibility determination; we cannot say that the trial court's resolution against appellant was erroneous. With the

facts resolved in the officers' favor, their actions did not transgress the fourth amendment. Evidence discovered in plain view, from a place where officers are entitled to stand and where their claim to stand is not created as a pretext solely to legitimate otherwise impermissible intrusions, is not the subject of a "search" within the meaning of that amendment; seizing such evidence does not trigger the warrant requirement.

### E. Firearms Receipts; Chain of Custody

■ Finally, Kaiser claims that firearms purchase receipts seized from an apartment where he stayed during the period immediately following the shooting should not have been admitted because the government failed to establish an adequate chain of custody. The trial court found such a chain. Any error in that determination was harmless; adequate independent evidence connected Kaiser to the pistols and the time of purchase indicated on the receipts.

### CONCLUSION

None of the alleged trial errors mandate reversal of the judgment of conviction for first degree murder. The anachronistic provision under which Kaiser was sentenced, however, cannot support the ultimate punishment. The suggestion that the federal government might salvage its death penalty statute while state statutes of the same genre are sent to the grave of unconstitutionality will not be countenanced. Accordingly, the judgment below is REVERSED IN PART to permit substitution of a sentence of life imprisonment; otherwise it is AFFIRMED.

1. The indictment was returned in the United States District Court for the Middle District of Georgia, Columbus Division, and reads in pertinent part as follows:
THE GRAND JURY CHARGES:
*COUNT ONE*
That on or about the 28th day of August, 1973, in the Columbus Division of the Middle District of Georgia, and within the jurisdiction of this court, at Fort Benning, Georgia, within and upon lands acquired for the use of the United States and under the exclusive jurisdiction thereof,

AINSWORTH, Circuit Judge dissenting:

I concur in the judgment of the court affirming defendant Kaiser's conviction; however, I dissent from that part of the court's opinion which reverses the sentence of death by electrocution and substitutes a sentence of life imprisonment.

Peter Gaston Kaiser was indicted along with Larry Fate Fortune for having "with malice aforethought, wilfully, deliberately and maliciously and with premeditation" killed Charles James White, Jr. by means of a firearm, at Fort Benning, Georgia, in violation of the federal statute, 18 U.S.C. § 1111, pertaining to murder within the special maritime and territorial jurisdiction of the United States.[1] Kaiser was convicted by a jury of first degree murder and sentenced to death.[2]

The full text of 18 U.S.C. § 1111 reads as follows:

§ 1111. Murder

(a) Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, rape, burglary, or robbery; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.

Any other murder is murder in the second degree.

(b) Within the special maritime and territorial jurisdiction of the United States,

PETER GASTON KAISER
LARRY FATE FORTUNE
with malice aforethought, wilfully, deliberately and maliciously and with premeditation did kill Charles James White, Jr., by means of a firearm; all in violation of Title 18, United States Code, Section 1111, i/c/w/ Title 18, United States Code, Section 2.

2. Fortune pled guilty after the trial started and received a life sentence.

Whoever is guilty of murder in the first degree, shall suffer death unless the jury qualifies its verdict by adding thereto "without capital punishment", in which event he shall be sentenced to imprisonment for life;

Whoever is guilty of murder in the second degree, shall be imprisoned for any term of years or for life. June 25, 1948, c. 645, 62 Stat. 756.

The Reviser's Note in U.S.C.A. to the above article states:

Based on Title 18, U.S.C., 1940 ed., §§ 452, 454, 567 (Mar. 4, 1909, c. 321, §§ 273, 275, 330, 35 Stat. 1143, 1152 [Derived from R.S. § 5339; Jan. 15, 1897, c. 29, § 1, 29 Stat. 487].)

Further research discloses that section 1111 has its origin in the First Congress of the United States by virtue of the Act of April 30, 1790, 1st Cong. Sess. II, ch. IX, sec. 3 (1 Stat. 112, 113 (1790)) which reads as follows:

And be it [further] enacted, That if any person or persons shall, within any fort, arsenal, dock-yard, magazine, or in any other place or district of country, under the sole and exclusive jurisdiction of the United States, commit the crime of wilful murder, such person or persons on being thereof convicted shall suffer death.

(Emphasis in original.)

Thus, from the dawn of this Nation's history, there has been a federal statute enacted by Congress, condemning the crime of murder within the sole and exclusive jurisdiction of the United States (such as Fort Benning, Georgia, in the present case) and prescribing the death penalty on conviction. For 186 years the death penalty provision of the statute (as now amended) has survived constitutionality until the majority decision here striking it down.

The circumstances of the murder involved in this case are especially aggravated. Two men, defendants Kaiser and Fortune, abducted their victim, White, at Columbus, Georgia, and took him in his car to an isolated, wooded area of the undeveloped portion of the military reservation of Fort Benning, Georgia. White was ordered out of the car and made to lie on the ground and then defendants Kaiser and Fortune took turns shooting at him, finally killing him with bullets in the head. The defendants admitted the killing to friends immediately afterwards, one prosecution witness testifying that Pete (Kaiser) told him that "They had shot a nigger," and that "They had taken turns shooting him and then they joked about it. He (Kaiser) told Larry (Fortune) something about Larry kept on missing him and Larry said at least he tried." They robbed White of his watch, wallet, driver's license and his automobile. The next morning they went out to the place of the murder to be sure the victim was dead. Soon thereafter they kidnapped a Mr. Hoover, at Columbus, Georgia, and fled with him into Texas where they were apprehended in the possession of the two pistols used in killing the victim, White, and also of White's driver's license. The murder was committed in the most wilful and deliberate fashion and in the perpetration of a robbery. It is difficult to conceive of a more premeditated and heinous killing.

The majority opinion bases its holding of the unconstitutionality of the death penalty in section 1111 first on the Supreme Court's decision in Furman v. Georgia, supra, wherein the death penalty under Georgia criminal statutes was set aside as unconstitutional. The opinion asserts that the federal murder statute involved here is "cut from the same die as that condemned as cruel and unusual" in the Georgia cases. The majority then states that the federal courts and federal prosecutors since Furman have generally concluded that the capital punishment provision of section 1111 is unconstitutional. Of course, all federal prosecutors have not so concluded since in the instant case the United States Attorney for the Middle District of Georgia (Mr. Knight) contends in his brief to this court that the death penalty provision of section 1111 is constitutional. The majority concludes that the 1976 death penalty cases, Gregg v. Georgia, supra, and companion cases, together with those decided in 1972, provide the basis for its holding that the

death penalty provision of the federal statute, section 1111, is unconstitutional because the statute vests in the jury "standardless sentencing power." The plurality opinion in *Gregg, supra,* and companion cases, of Justices Stewart, Powell and Stevens upheld the constitutionality of the new Georgia, Florida and Texas capital punishment statutes on that basis, with its holding that these state statutes provide adequate standards and guidelines for a jury in reaching a verdict requiring capital punishment. The North Carolina and Louisiana statutes, however, were struck down in the 1976 decisions (in *Woodson v. North Carolina* and *Roberts v. Louisiana, supra*) because they provided mandatory death sentences for a broad range of homicides.

It is important to note that the plurality opinion of Justice White, Chief Justice Burger and Justice Rehnquist, in the Georgia, Florida and Texas cases, did not concur in the plurality opinion of Justices Stewart, Powell and Stevens, but only in the judgments of the Court. Justice Blackmun declined to join in either of the two plurality opinions, but concurred in the judgments.

By process of reasoning, the majority opinion uses an arithmetic calculation by adding the votes of the three Justices (Stewart, Powell and Stevens) who assert in the 1976 cases the standardless jury discretion rule as a violation of the Eighth and Fourteenth Amendments, with the two Justices (Brennan and Marshall) who are opposed to capital punishment under any circumstances, thereby arriving at a majority of five Justices which the majority opinion concludes forms the basis for its holding that the death penalty provision of section 1111 is unconstitutional.

I cannot subscribe to this method of predicting what the individual members of the Supreme Court will do under the circumstances of this case. It is clear, of course, that seven of the nine present members of the Court have concluded that capital punishment is not cruel and unusual punishment and is not unconstitutional *per se.* Whether a majority will ultimately hold that the death penalty in the present federal statute is unconstitutional for standardless jury discretion remains to be seen.

Section 1111 contains a detailed statement of the components which constitute murder in the first degree. The facts and circumstances here fully warrant the jury's finding of guilty of murder in the first degree within the statutory definition, as to defendant Kaiser. There were no extenuating circumstances in this case that could have taken it out of the category of first degree murder as defined in the statute. It was a cold-blooded, deliberate, malicious, premeditated killing of the victim, White, while he was prostrate on the ground during the perpetration of a robbery.

Perhaps a majority of the court may ultimately adopt the views of Justice Rehnquist well expressed in his dissent in *Woodson v. North Carolina,* 428 U.S. 280, at 319, 96 S.Ct. 2978, at 2998–3000, 49 L.Ed.2d 944 (1976), as follows:

The Court's insistence on "standards" to "guide the jury in its inevitable exercise of the power to decide which murderer shall live and which shall die" is squarely contrary to the Court's opinion in *McGautha, supra,* authored by Mr. Justice Harlan and subscribed to by five other Members of the Court only five years ago. So is the Court's latter-day recognition, some four years after the decision of the case, that *Furman* requires "objective standards to guide, regularize, and make rationally reviewable the process for imposing a sentence of death." Its abandonment of *stare decisis* in this repudiation of *McGautha* is a far lesser mistake than its substitution of a superficial and contrived constitutional doctrine for the genuine wisdom contained in *McGautha.* There the Court addressed the "standardless discretion" contention in this language:

"In our view, such force as this argument has derives largely from its generality. Those who have come to grips with the hard task of actually attempting to draft means for channeling capital sentencing discretion have confirmed the lesson taught by the history

recounted above. To identify before the fact those characteristics of criminal homicides and their perpetrators which call for the death penalty, and to express these characteristics in language which can be fairly understood and applied by the sentencing authority, appear to be tasks which are beyond present human ability.

"Thus the British Home Office, which before the recent abolition of capital punishment in that country had the responsibility for selecting the cases from England and Wales which should receive the benefit of the Royal Prerogative of Mercy, observed:

" 'The difficulty of defining by any statutory provision the types of murder which ought or ought not to be punished by death may be illustrated by reference to the many diverse considerations to which the Home Secretary has regard in deciding whether to recommend clemency. No simple formula can take account of the innumerable degrees of culpability, and no formula which fails to do so can claim to be just or satisfy public opinion.' 1–2 Royal Commission on Capital Punishment, Minutes of Evidence 13 (1949)." 402 U.S., at 204–205, 91 S.Ct., at 1466.

. . . . .

"In light of history, experience, and the present limitations of human knowledge, we find it quite impossible to say that committing to the untrammeled discretion of the jury the power to pronounce life or death in capital cases is offensive to anything in the Constitution. The States are entitled to assume that jurors confronted with the truly awesome responsibility of decreeing death for a fellow human will act with due regard for the consequences of their decision and will consider a variety of factors, many of which will have been suggested by the evidence or by the arguments of defense counsel. For a court to attempt to catalog the appropriate factors in this elusive area could inhibit rather than expand the scope of consideration, for no list of circumstances would ever be really complete. The infinite variety of cases and facets to each case would make general standards either meaningless 'boiler-plate' or a statement of the obvious that no jury would need." 402 U.S., at 207–208, 91 S.Ct., at 1467 (citation omitted).

It is also worth noting that the plurality opinion repudiates not only the view expressed by the Court in *McGautha,* but also, as noted in *McGautha,* the view which had been adhered to by every other American jurisdiction which had considered the question. See 402 U.S., at 196 n. 8, 91 S.Ct., at 1461.

I am unable to hold that the death penalty provision of the federal murder statute is unconstitutional on the basis of existing precedent of the Supreme Court since it is far from clear that our highest court would nullify the death penalty provision in section 1111. The plurality of three Justices (Stewart, Powell and Stevens) have required sentencing standards and guidelines for the jury to use in assessing the death penalty. Whether this view will continue to prevail and is applicable here is something that will have to be left for another day to the wisdom of the Supreme Court. Given the long history of the death penalty in the federal murder statute involved in this case, the serious and aggravated circumstances under which the killing was committed which fully justified the unanimous verdict of the jury of first degree murder carrying with it the death penalty, I would defer to the will of Congress as reflected in the present statute and uphold the constitutionality of the death penalty.