**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Ronald W. SHEPHERD,
Defendant-Appellant.**

**No. 77–1130.**

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 5, 1977.

Decided May 8, 1978.

Rehearing Denied June 15 and
July 6, 1978.

Stephen L. Trueblood, Terre Haute, Ind., Ronald E. Hahn, Chicago, Ill., Norman L. Lowery, Terre Haute, Ind., for defendant-appellant.

Bradley L. Williams, Asst. U. S. Atty., Indianapolis, Ind., for plaintiff-appellee.

Before FAIRCHILD, Chief Judge, TONE, Circuit Judge, and CAMPBELL, Senior District Judge.*

TONE, Circuit Judge.

Ronald W. Shepherd was one of four prisoners serving sentences in the federal penitentiary at Terre Haute, Indiana, who were tried before a jury under an indictment charging that they murdered a fellow prisoner in violation of 18 U.S.C. § 1111. The jury found Shepherd and two other defendants guilty and the fourth not guilty. After the foreman had announced these verdicts but before the jury was polled, the judge made certain remarks in the jury's presence that Shepherd argues require a

---

* The Honorable William J. Campbell, Senior District Judge of the United States District Court for the Northern District of Illinois, is sitting by designation.

new trial because of their impairment of the right of polling. Also, Shepherd argues that he was charged with a capital crime and that therefore his request under 18 U.S.C. § 3005 for two attorneys should have been granted. We reject these and other arguments and affirm the conviction.

The appeals of Shepherd and the two other defendants were heard together. Only Shepherd raises the two issues described above. His other arguments and the arguments of the other defendants raise issues concerning the application of recognized rules of law to the particular facts of the case and are therefore disposed of by unpublished order under Circuit Rule 35.

## I.

### A.

Owing to severely inclement weather and the fact that the defendants and many of the trial witnesses were prisoners, the trial was conducted over eight consecutive days, and usually well into the evening hours. The jury retired to deliberate on its verdicts at approximately 4:00 P. M. on Monday, January 24, 1977. In his instructions and admonitions to the jury before they retired, the judge stated that after they returned their verdict they would be polled individually, and that their verdict must be unanimous. The record shows no inquiries or other communications by the jury to the court until the return of the verdicts at noon on the following day.

After the clerk announced the verdicts finding Shepherd, Vaughn, and Cantrell guilty and Sparks not guilty, counsel for all parties examined the verdict forms, each of which was signed by the foreman only and stated that the jury had reached its verdict and what that verdict was. The judge then called Sparks, the acquitted defendant, before the bench, and the following occurred:

The Court: Mr. Sparks, this jury has found you not guilty of the crime of murder, second-degree murder, and voluntary manslaughter. You know whether you were guilty or not, and you are just the beneficiary of a very fine lawyer and this great judicial system that this country has, and our great Constitution.

Many a jury would have found you guilty: you had the gun together with these other men. You stood there at the—

Mr. Sparks: A lie, your Honor.

The Court: Mr. Lippie didn't testify you put your hand on him, right on the dead man; because of some other misconduct on the part of Mr. Lippie he wasn't used as a witness, you understand.

Mr. Sparks: Yes, sir.

The Court: You are discharged. You have to live with these other men, and you know whether you were or not. You are just a very, very fortunate man.

I only hope, by liberation of you, that there isn't somebody else killed out in this penitentiary because they get away with it. We had twelve of them get away with it a year ago, and so long as you have that kind of a system working there will be some people continue to kill people in the penitentiary. Inmates in the penitentiary are entitled to have the protection of law, just like other citizens have, and you are still there, still committing the crimes.

Now will the marshal remove him? We'll process the other defendants.

The Court thanks you, counsel for your excellent service in representing this man.

 All defense counsel remained silent throughout this colloquy, at the conclusion of which the judge offered all counsel the opportunity to poll the jury. Counsel for Vaughn then polled the jury, addressing each juror individually.[1] All twelve jurors

1. Rule 31(d), Fed.R.Crim.P. (see note 2, *infra* ), does not prescribe the manner in which the poll is to be conducted. This is a matter left to the discretion of the trial judge. *Shibley v. United States*, 237 F.2d 327, 334 (9th Cir.), *cert. denied*, 352 U.S. 873, 77 S.Ct. 94, 1 L.Ed.2d 77 (1956). Section 5.5 of the *ABA Standards Relating to Trial by Jury* (Approved Draft, 1968) suggests that "the poll be conducted by the court or the clerk of court asking each juror individually whether the verdict announced is his verdict." We agree that this is the best practice.

confirmed their verdict. Counsel for Shepherd, before polling the jury, moved for a mistrial on the ground that the court's "admonishment" of defendant Sparks had "effectively denied his [Shepherd's] right to poll the jury." The motion was denied, and Shepherd's counsel then proceeded to poll the jurors; each of whom confirmed his verdict. Counsel for defendant Cantrell then polled the jurors with the same result.

After the individual polls were conducted, the judge addressed the jury as follows:

It appears the verdict as to the three defendants is unanimous.

Now, ladies and gentlemen, you heard the verdicts that were read in open court here in your presence, in the presence of the parties and the lawyers here. Were the verdicts that were read in open court your verdicts upstairs, unanimously before you came downstairs and heard the verdicts read in open court? If not, would you hold up your hand?

None of the jurymen have held up their hands, and by your conduct in not holding up your hands you have undertaken to say that each of you voted for conviction of these three defendants as the verdicts say in writing, here, and signed—and each one is signed by your foreman, and you so say that you voted for such conviction in the privacy of your jury room before you came down here.

If there is any question about this, hold up your hand.

None of the jurymen have held up their hand, so your verdicts were returned in the privacy and made up in the privacy of the jury room, unanimously.

The judge then ordered the entry of judgments of guilty.

#### B.

■ The government argues that Shepherd should be precluded from asserting the alleged error by his counsel's failure to object until after the judge had finished his remarks and was ready to poll the jury, at which time it was too late for prevention of any error. Noting that counsel could have prevented any damage by reminding the court that the jury had not been polled, and that he was alert enough to move for a mistrial when it was his turn to poll the jury, we find some merit in this argument. In view of the unexpected turn of events, however, and the unusual situation confronting counsel, we hold that his conduct did not amount to a waiver. See Fed.R. Crim.P. 51; *cf. United States v. Panczko*, 429 F.2d 683, 686 (7th Cir.), *cert. denied*, 400 U.S. 946, 91 S.Ct. 253, 27 L.Ed.2d 252 (1970).

■ The government also relies upon the rule that a federal district judge may comment on the evidence. See *Capital Traction Co. v. Hof*, 174 U.S. 1, 13–14, 19 S.Ct. 580, 43 L.Ed. 873 (1899); *United States v. Natale*, 526 F.2d 1160, 1166–1167 (2d Cir. 1975), *cert. denied*, 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 193 (1976); *United States v. DePugh*, 434 F.2d 548, 554–555 (8th Cir. 1970), *cert. denied*, 401 U.S. 978, 91 S.Ct. 1208, 28 L.Ed.2d 328 (1971). That rule may justify the judge's statement about a gun, by which he must have meant, and the listeners must have understood him to mean, knife, since there was no evidence of a gun. If "knife" is substituted for "gun," the fact stated was established by overwhelming evidence and not refuted in any way. The rule would not, however, justify other parts of the judge's remarks, which therefore must be tested under the harmless error doctrine. Fed.R.Crim.P. 52(a).

#### C.

■ To decide whether the error was harmless, we inquire not whether the defendant was in fact guilty but "what effect the error had or reasonably may be taken to have had upon the jury's decision." *Kotteakos v. United States*, 328 U.S. 750, 764, 66 S.Ct. 1239, 1247, 90 L.Ed. 1557 (1946) (per Rutledge, J.). The inquiry must "take account of what the error meant to [the jury], not singled out and standing alone, but in relation to all else that happened." *Id.* If we are convinced that "the error did not influence the jury, or had but very

slight effect," and can say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error," we should hold the error harmless. *Id.* at 764, 765, 66 S.Ct. at 1248. See also *United States v. Panczko, supra,* 429 F.2d at 686–688. Relevant to this inquiry are the stage of the case at which the error occurred, whether the objectives designed to serve the polling procedure were attained despite the error, and the evidence of Shepherd's guilt, not, however, for its effect in convincing us, but for its probable effect in convincing reasonable jurors.

### D.

■ The fact that the judge's comments were made not during the trial, but after the jury's deliberations, is significant. The possibilities to be assessed here are either (a) that the jury, having been instructed that its verdict must be unanimous, nevertheless returned to the courtroom and announced a verdict that was not unanimous, and the dissenting juror or jurors were intimidated into remaining silent by the judge's comments; or (b) that one or more jurors, after having joined in the unanimous verdict, would have changed their minds absent the judge's comments. These possibilities are obviously far less likely than the possibility that the same error, if it had occurred during the trial, would have affected the verdict. The Fifth Circuit has said:

> The right of a defendant to poll the jury is of course recognized and long established, but from a practical standpoint, experience of the years has shown that its benefit to a defendant in effecting a change or modification of the jury's verdict is substantially nonexistent.

**2.** Rule 31(d) states:

> When a verdict is returned and before it is recorded the jury shall be polled at the request of any party or upon the court's own motion. If upon the poll there is not unanimous concurrence, the jury may be directed to retire for further deliberations or may be discharged.

*Martin v. United States,* 182 F.2d 225, 227 (5th Cir.), *cert. denied,* 340 U.S. 892, 71 S.Ct. 200, 95 L.Ed. 647 (1950).

### E.

■ The right to poll the jury is provided by Rule 31(d), Fed.R.Crim.P.[2] While of ancient origin, see *Miranda v. United States,* 255 F.2d 9, 17 (1st Cir. 1958), the right is not of constitutional dimensions. See *Hernandez v. Delgado,* 375 F.2d 584, 585 (1st Cir. 1967). Yet it has been described as substantial, and, if it is seasonably asserted,[3] its denial is reversible error. *Mackett v. United States,* 90 F.2d 462, 465–466 (7th Cir. 1937); see also *Miranda v. United States, supra.*

From the earliest times there has been a presumption, unless the polling shows otherwise, that when the jury returns from its deliberations to announce its verdict it has obeyed the court's instruction that if a verdict is returned it must be a unanimous one:

> [N]ow touching the giving up of their verdict, if the jury say they are agreed, the court may examine them by poll, and if in truth they are not agreed, they are finable.

2 Hale, *History of the Pleas of the Crown* 299 (1st Am. ed., Stokes and Ingersoll, 1847).

As the usual question put to each juror, "Was this and is this now your verdict," suggests, a juror has a right to change his mind about a verdict to which he has agreed in the jury room. See *e.g., United States v. Taylor,* 507 F.2d 166, 168 and n.2 (5th Cir. 1975); *United States v. Sexton,* 456 F.2d 961, 966–967 (5th Cir. 1972); 4 *Wharton's Criminal Procedure* § 586 (12th ed. 1976). This seems to have been true at common law. *Cf.* 2 Coke, First Part of the Institutes § 366 (16th ed., Philadelphia, 1812). Experience teaches, however, that

**3.** Polling is not required unless it is requested by a party. The request must come between the return of the verdict and the time the verdict is recorded. The trial judge must allow adequate time for the request. *United States v. Marr,* 428 F.2d 614, 615 (7th Cir. 1970). It is not contended here that the request was unseasonable.

the likelihood of such a change of mind is remote. *Martin v. United States, supra,* 182 F.2d at 227.

■ The purpose of affording a right to have the jury polled is not to invite each juror to reconsider his decision, but to permit an inquiry as to whether the verdict is in truth unanimous. As Judge Maris said in *Miranda v. United States, supra,* 255 F.2d at 17:

> The object is to give each juror an opportunity, before the verdict is recorded, to declare in open court his assent to the verdict, which the foreman has returned and thus to enable the court and the parties to ascertain with certainty that a unanimous verdict has in fact been reached and that no juror has been coerced or induced to agree to a verdict to which he has not fully assented.

Accord, *Humphries v. District of Columbia,* 174 U.S. 190, 194, 19 S.Ct. 637, 43 L.Ed. 944 (1899); *United States v. Sexton, supra,* 456 F.2d at 966; *United States v. Lockhart,* 366 F.Supp. 843, 847 (E.D.Pa.1973), aff'd, 495 F.2d 1369 (3d Cir. 1974); 4 *Wharton's Criminal Procedure, supra,* § 586; *Comment,* 39 Yale L.J. 1218, 1219 (1930). It has also been said that the poll's purpose "is to test the uncoerced unanimity of the verdict by requiring 'each juror to answer for himself, thus creating individual responsibility, eliminating any uncertainty as to the verdict announced by the foreman.'" *United States v. Mathis,* 175 U.S.App.D.C. 341, 345, 535 F.2d 1303, 1307 (1976), quoting *Frady v. United States,* 121 U.S.App.D.C. 78, 82–83, 348 F.2d 84, 88–89 (1965) (plurality opinion of Fahy, J.), which in turn quotes from *State v. Vaszorich,* 13 N.J.2d 99, 126, 98 A.2d 299, 314, *cert. denied,* 346 U.S. 900, 74 S.Ct. 219, 98 L.Ed. 400 (1956). See also *United States v. Taylor, supra,* 507 F.2d at 168. A poll also assures that there is no mistake in the written verdict. *Jones v. Estelle,* 538 F.2d 651 (5th Cir. 1976); 8

Wigmore on Evidence § 2348 at pp. 680–681 (McNaughton rev. 1961).

### F.

■ We think it highly unlikely that, as a result of the judge's comments, the objectives the polling procedure is designed to serve were not attained in this trial. It must be remembered that we are to "take account of what the error meant to [the jury], not singled out and standing alone, but in relation to all else that happened," *Kotteakos v. United States, supra,* 328 U.S. at 764, 66 S.Ct. at 1248. The possibility that the foreman, through mistake or misunderstanding, announced a verdict although the jurors were not unanimous is remote, in view of the clear instruction on the necessity of unanimity and the sophistication evidenced by the acquittal of one defendant and the conviction of the other three.[4] That acquittal also makes it seem unlikely that a majority of the jurors were so overzealous or inflamed that they were able to coerce one or more other jurors. The absence of other errors also reduces the possibility that any juror's vote was based on matters other than the merits and thus vulnerable to pangs of conscience after further consideration.[5] Finally, the overwhelming evidence of Shepherd's guilt, to which we now turn, makes it unlikely that any juror would have favored acquittal in the jury room or would have wished to change his mind after the verdict was announced by the foreman.

### G.

Two inmate witnesses testified to having seen Shepherd stab the victim; one said the victim was held by Vaughn and Cantrell at the time of the stabbing; the other identified only Vaughn as a holder. A third inmate witness testified that he saw Vaughn and Cantrell, who were with Shepherd before the stabbing, and another per-

---

4. The evidence of the acquitted defendant's guilt was considerably weaker than the evidence against the convicted defendants, the force of which is pointed out in Part G, *infra.*

5. We have examined the other claims of error asserted by Shepherd and have concluded that no other error occurred. Our rulings on these claims are explained, as we said above, in an unpublished order.

son perpetrate the crime, and that he could not see who the other person was. Vaughn, Cantrell, and Shepherd were together before the stabbing and were heard discussing the victim.

In addition, the first two witnesses both identified a black-handled knife as the weapon used by Shepherd to stab the victim.[6] They had seen this same knife in Shepherd's possession when he was with Vaughn and Cantrell at various times shortly before the stabbing. One testified that before the stabbing he saw Shepherd hide the knife in some bushes. Immediately before the stabbing, Shepherd was seen putting on handball gloves. Immediately after the stabbing, both witnesses testified they saw Shepherd throw this same knife into a hedge while running from the scene of the stabbing. Two prison guards, after the incident, found the knife in the hedge. Laboratory reports showed traces of human blood on the knife.

With the exception noted below, there was no testimony directly exculpating Shepherd. Four defense witnesses testified that they were in the close vicinity of the stabbing but did not see the incident. Their testimony was that upon hearing a shout, a scream, or a scuffle, they turned around and saw some or all of the three convicted defendants running from the area of the stabbing in the same direction the eyewitnesses testified the defendants were running. The inference the defendants hoped would be drawn from this testimony was that, since immediately after the stabbing they were seen some distance from the place the stabbing occurred, they could not have perpetrated the crime. Depending on the time lapse between the stabbing and the sound that caused a witness to turn around, and the reliability of his estimate of the time lapse between hearing the sound and turning around, this defense testimony is perhaps more corroborative of than inconsistent with the testimony of the eyewitnesses to the stabbing.

The last defense witness, James Shields, testified that he alone had committed the murder. He was serving a twenty-five year sentence (for kidnapping), consecutive to which he was and is subject to two consecutive life sentences in state prisons (for murder) and another ten year sentence. Shields is six-feet tall and weighs 150 pounds. The victim was six-feet, four-inches tall, weighed 190 pounds, and was of above average strength, having been a weight lifter. Moreover, the doctor who performed the autopsy testified that the victim's body had no "defense wounds," i.e., scratches that would result from attempting to fend off a stabbing; this indicated that the victim was being held when he was stabbed.[7] On cross-examination, when asked to detail the stabbing, Shields refused to answer on the ground of the Fifth Amendment. On rebuttal, the government produced an employee at the penitentiary, who testified that Shields and the defendants were able to communicate with each other immediately after the stabbing, notwithstanding the fact that all were in maximum security solitary confinement.[8]

Applying the harmless error standard stated in Part C, above, we are convinced that "the error did not influence the jury" and "can say with fair assurance . . . that the judgment was not substantially swayed by the error," which was therefore

---

6. A second knife was seen in the possession of Vaughn and Cantrell shortly before the stabbing; they handed it through a window to another inmate shortly after the stabbing. The doctor who performed the autopsy testified that the appearance of the wounds indicated that they were inflicted by two knives, with different shaped blades.

7. See also note 6, *supra*, concerning the doctor's testimony that the appearance of the wounds indicated that the stabbing was done by two knives.

8. This was proper rebuttal testimony because Shields had testified that he and the defendants were in solitary confinement after the stabbing, from which the jury might have inferred that Shields and the defendants were incapable of communicating with each other. The employee's testimony as to the physical structure of the maximum security solitary confinement cells negatived this possible inference. See *Davis v. United States*, 133 U.S.App.D.C. 167, 169 n.7, 409 F.2d 453, 455 n.7 (1969).

clearly harmless, and, if it were necessary to go so far, harmless beyond a reasonable doubt.

## II.

After the oral argument Shepherd filed, with leave of court, a supplemental *pro se* brief in which he argues that he is entitled to a new trial because the court denied his request for the appointment of two attorneys to represent him. He relies upon the first sentence of 18 U.S.C. § 3005, which provides as follows:

> Whoever is indicted for treason or other capital crime shall be allowed to make his full defense by counsel learned in the law; and the court before which he is tried, or some judge thereof, shall immediately, upon his request, assign to him such counsel, not exceeding two, as he may desire, who shall have free access to him at all reasonable hours.

The government argues that the violation for which Shepherd was indicted is no longer a "capital crime," because before the crime was committed and the indictment was returned the Supreme Court in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), had held unconstitutional state death penalty provisions that are indistinguishable, *United States v. Kaiser,* 545 F.2d 467 (5th Cir. 1977), from that in 18 U.S.C. § 1111.

The right to two counsel granted by § 3005 is one of several rights provided for defendants accused of capital crimes that had their origin in § 29 of the first federal crimes act, the Act of April 30, 1790, 1 Stat. 118–119. Others are the rights granted by present 18 U.S.C. § 3432, to be furnished, at least three days before trial, with a list of the veniremen and a list of the witnesses to be produced at trial.[9]

The Fifth Circuit has held that the right to a list of witnesses under § 3432 does not apply to a prosecution under a statute providing for a death penalty when the possibility of the imposition of that penalty has been removed by a Supreme Court decision, *United States v. Kaiser, supra,* 545 F.2d at 475 (the *Furman* decision); *United States v. Hoyt,* 451 F.2d 570 (5th Cir. 1971), *cert. denied,* 405 U.S. 995, 92 S.Ct. 1272, 31 L.Ed.2d 465 (1972) (the decision in *United States v. Jackson,* 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968). The Fourth Circuit reached the same result when the prosecutor disavowed any intention of seeking the death penalty. *Hall v. United States,* 410 F.2d 653, 660–661, *cert. denied,* 396 U.S. 970, 90 S.Ct. 455, 24 L.Ed.2d 436 (1969).[10] In *United States v. Watson,* 496 F.2d 1125 (1973), however, a divided panel of the Fourth Circuit, without mentioning *Hall,* held that "capital crimes" in the two counsel clause of § 3005 means a crime Congress has declared to be punishable by death rather than a crime that is in fact punishable by death. And in *United States v. Massingale,* 500 F.2d 1224 (4th Cir. 1974), that court again ignored *Hall* and distinguished *Watson* because Congress itself had removed the death penalty for kidnapping, which was the offense charged in *Massingale.*[11]

*Watson* is factually distinguishable from the case at bar because the indictment and trial in that case antedated *Furman,* but the decision does not rest on that ground. *United States v. Watson, supra,* 496 F.2d at 1126 n.4. The court found itself unable to

---

**9.** As adopted in 1790, § 29 provided for a list of veniremen in all capital cases (three days before trial in a treason prosecution, two days in other capital cases) but a list of witnesses was required only in treason cases.

**10.** The Eighth and Ninth Circuits have followed an approach similar to *Hall*; see text accompanying notes 12 and 13, *infra.*

**11.** See also *Provenzano v. United States,* 423 F.Supp. 662 (S.D.N.Y.1976), *aff'd by unpublished order,* 556 F.2d 562 (2d Cir. 1977), where

Judge Stewart held that when, in 1972, Congress removed the death penalty provisions of 18 U.S.C. § 1201 (kidnapping), that crime was no longer a capital crime for purposes of the applicable statute of limitations (18 U.S.C. §§ 3281, 3282), although he intimated that he would not have reached the same result if the death penalty had been abrogated only by the Supreme Court (*United States v. Jackson,* 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968)) and not by Congress.

say "that the possibility of imposition of the death penalty was the *sole* reason why Congress gave an accused the right to two attorneys" (emphasis in original), and expressed the belief that Congress left 18 U.S.C. § 1111 unchanged after *Furman* because "it is more likely than not that an alleged offense of the type for which Congress has purportedly continued the death penalty will be a complex and difficult case to prepare and try," and such an offense is likely to generate revulsion and prejudice, making enforcement of procedural rules more important. *Id.* at 1128. The dissenting judge argued that after *Furman*'s abrogation of the possibility of imposition of the death penalty, murder in violation of § 1111 was no longer a capital crime. We respectfully disagree with the position of the majority in *Watson.**

Before turning to our reason for declining to follow *Watson*, we note that the Eighth and Ninth Circuits have held that when the prosecution commits itself not to seek the death penalty for an offense otherwise punishable by death, the defendant is not entitled to 20 peremptory challenges under Rule 24(b), Fed.R.Crim.P., which gives that right in prosecutions for crimes "punishable by death." [12] *United States v. McNally*, 485 F.2d 398, 406–407 (8th Cir. 1973), *cert. denied*, 415 U.S. 978, 94 S.Ct. 1566, 39 L.Ed.2d 874 (1974); *United States v. Martinez*, 536 F.2d 886, 890 (9th Cir. 1976), following *Loux v. United States*, 389

F.2d 911, 915 (9th Cir. 1968), *cert. denied*, 393 U.S. 867, 89 S.Ct. 151, 21 L.Ed.2d 139 (1968). Since "capital crime" means crime punishable by death, these cases are analogous to the one before us, even though they do not involve § 3005.[13] We turn back now to that section.

■ Section 3005 applies only to a "capital crime." The term "capital," when used to modify "crime," means punishable by death. Webster's Third New International Dictionary 332 (1971). In that context it has no other meaning. Nevertheless, we can conceive of a case in which the reason for a particular requirement is the seriousness of the crime rather than the penalty, yet at the time the requirement was adopted the word "capital" served to define the serious crimes to which the requirement was to apply. It is therefore appropriate to look beyond the dictionary for Congress' intention.

■ There is no clue, however, in the legislative history from 1790, when the two counsel provision first appeared, to the present [14] as to why Congress adopted the provision initially or has continued it in force. See *United States v. Watson, supra*, 496 F.2d at 1128, 1130 (Murray, J., dissenting). We are therefore left to inference. In our opinion, the reason for this and the other procedural provisions giving defendants added rights in capital cases, is humane rather than pragmatic. We believe

---

\* Inasmuch as our holding on this issue conflicts with the Fourth Circuit's opinion in *Watson*, this opinion has been circulated among all of the regular, active judges of this Court, none of whom favored a rehearing *in banc* with respect to that conflict.

12. Shepherd's argument fails under this approach. The prosecution, prior to trial, disavowed in writing any intention of seeking the death penalty because of the *Furman* decision, and in the same document, asserted that § 3005 was therefore inapplicable.

13. It should be noted, however, that the court in *Martinez*, although holding that after the prosecution renounced the death penalty the prosecutions under 18 U.S.C. § 1111 "were no longer capital cases requiring compliance with the 20 peremptory challenge provisions of Rule 24(b)," stated that its holding was not incon-

sistent with *Watson*; but the court offered no explanation of that statement except to cite *United States v. Freeman*, 380 F.Supp. 1004 (D.N.D.1974) (subsequently affirmed without reference to this point, 514 F.2d 171 (8th Cir. 1975)), which seems to undermine rather than support the statement. *Freeman* holds that in view of *Furman* a prosecution under § 1111 is not a capital case and is not subject to the procedural provisions for capital cases contained in 18 U.S.C. § 3432 and Rule 24(b). State courts are divided on the question of whether procedural rules for capital cases continue to apply after *Furman*. See Annot., 71 ALR 3rd 453 (1976).

14. 18 U.S.C. § 3005, in which the provision now appears, was adopted in 1948, 62 Stat. 814, and has not been amended.

the purpose of the two counsel provision was to reduce the chance that an innocent defendant would be put to death because of inadvertence or errors in judgment of his counsel, and to attempt to prevent mistakes that would be irrevocable because of the finality of the punishment. Many kinds of criminal cases are typically more complex and difficult to prepare and try than those for which Congress has provided the death penalty. Yet no provision has been made for more than one appointed counsel in any but those involving a "capital crime." There is nothing in Congress' action or inaction over the years to indicate that the two-counsel provision was intended to apply to any case in which a death sentence could not be imposed.

We hold that the provision does not apply because there is no possibility that the death penalty can be imposed. The judgment of conviction is affirmed.

AFFIRMED.