UNITED STATES of America,
Plaintiff-Appellee,

v.

Nathaniel GREEN, Defendant-Appellant.

No. 81–2107.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 8, 1982.

Decided June 15, 1982.

Robert C. Babione, Asst. Federal Defender, East St. Louis, Ill., for defendant-appellant.

James R. Burgess, Jr., U. S. Atty., Marsha L. Johnson, East St. Louis, Ill., for plaintiff-appellee.

Before SPRECHER * and POSNER, Circuit Judges, and BONSAL,** Senior District Judge.

BONSAL, District Judge.

On June 26, 1980, Nathaniel Green was indicted by a grand jury in the Southern District of Illinois, charged with kidnapping for the purpose of committing murder in violation of 18 U.S.C. § 1201(a)(1). Having waived a jury, Green was found guilty following a bench trial before Beatty, J. and was sentenced to 100 years' imprisonment. Green appeals.

On Saturday, May 24, 1980, Rhonda Gillihan, a 17-year-old white girl, and Nathaniel Green, a young black man, attended a barbecue at Emmett Ware's apartment in the El Cid Apartments complex in Charlack, Missouri. Ware testified that during the course of the evening he heard Green make a suggestive sexual remark about Rhonda. At a second party during the same evening, Bobby Saffold testified that he also heard Green make a similar remark about Rhonda. There was evidence that at approximately 2:30 a. m. Rhonda was seen leaving the second party, with Green following her, and that shortly thereafter she arrived again at Emmett Ware's apartment. Ware testified that she appeared nervous and upset and said to him, "that little nigger is still bothering me"—whom he identified as Green.

The evidence indicates that Rhonda left Ware's apartment at approximately 3:30 a. m. on May 25th, and three boys testified that they were in the El Cid's parking lot between 3:30 and 4:00 a. m. and heard a female voice yelling from a brown 1961 Chevrolet, which was identified as Rhonda's car. The boys observed a male and female silhouette, the male being either outside the car or on the driver's side of the front seat and the female on the passenger's side of the front seat; the figures appeared to be fighting and the male reached over to muffle the female's voice. The boys observed the male striking the female with his right hand and heard the female scream with pain. Two of the boys testified that they observed the same car two days later, on May 27th, parked a few feet from where they had first seen it, and testified that the police were examining it. The police at Charlack had received a report that Rhonda's car was parked at the El Cid complex, containing blood stains on the steering wheel, the seat, and the floor near the passenger's side. The police found a blood-stained shirt in the car.

Also two days later, on May 27th, Rhonda's nude body was found in an overgrown and relatively deserted area across the river from Charlack, Missouri, in East St. Louis, Illinois.

Green was interviewed and fingerprinted by the Charlack police on May 29th and 30th, 1980. Recent stab wounds were observed on his left forearm, his left side, and on his right index finger. Green explained that the wound on his left forearm was caused when Rhonda stabbed him with a pocket knife. He also told the police that he had attended the barbecue and the second party which Rhonda had attended on the night of May 24th. He admitted that he had made a comment about Rhonda at the second party and said he had followed her outside to apologize, but that she had

* Judge Sprecher's untimely death occurred after the conference at which a tentative—and unanimous—vote to affirm the judgment below was taken but before he had an opportunity to read and vote on the opinion circulated by Judge Bonsal.

** Senior District Judge Dudley B. Bonsal of the Southern District of New York is sitting by designation.

pulled out a pocket knife and stabbed him in the left arm. He told the police that he then went home to get his sister's van, after which he returned to the apartment where the second party was being held. At this party, he picked up Bobby Saffold and Craig Wright and drove them to East St. Louis to buy some beer and, upon their arrival, Bobby Saffold directed him down a bumpy old street by an overgrown area where Saffold said he had to pick up a jacket at a nearby house. At the same place, Wright got into an old brown Chevrolet and led Green back to the El Cid at Charlack. By that time, it was almost daylight and Green said he went home. Green also told the police that while they were in East St. Louis he asked Saffold and Wright if they had had sex with Rhonda and they had told him that they had and that Saffold had hit Rhonda because she was prejudiced against black people.

On June 2, 1980, the police took Green to East St. Louis to identify the place where he had told them he had been with Saffold and Wright. The place to which he directed them was the place where Rhonda's body had been found.

On June 16th, during the course of another interview with the police, the police told Green that his story about Saffold and Wright and the trip to East St. Louis did not stand up, whereupon Green recanted and said that Rhonda had stabbed him at the El Cid complex and that afterwards he had gone home and stayed there.

On June 23, 1980, Green consented to give a blood sample to the FBI but did not appear at the time and place where it was to be taken. He was indicted three days later, on June 26, 1980, but was not apprehended until February 26, 1981 when he was located and arrested in New Orleans, Louisiana. Following his arrest, he was interviewed in New Orleans and gave another different version of the events on the night of the parties at the El Cid Apartments complex.

Green was returned to the Southern District of Illinois to face the charge in the indictment, and, having waived a jury, his bench trial commenced on June 1, 1981. The district court heard, among others, the several witnesses hereinbefore mentioned. The forensic pathologist who performed the autopsy on Rhonda testified that the multiple wounds he found on Rhonda were caused by a knife similar to a pocket knife. He also found two traumas on her head, one caused by a fist or blunt instrument, and the other caused by hitting her head against a flat surface; abrasions probably caused by dragging her body along the ground; a contusion which could have been caused by the heel of a shoe; and finally, that her death was caused by loss of blood. He also examined Green's wounds and testified that his wounds and Rhonda's were caused by the same type of instrument. A forensic serologist testified that genetic markers consistent with Green's blood type were found on Rhonda's shirt and on the steering wheel and other parts of her car, and he testified as to the frequency of occurrence of those markers in the population, which was comparatively rare. He also testified that the directional pattern of the blood splatters in the car were consistent with a bleeding wound striking the open passenger door.

On the basis of the evidence, the district court concluded that Green had murdered Rhonda and that the case was properly before a federal court as there was sufficient evidence that Rhonda was still alive when she was transported to Illinois. The court found, on the evidence hereinbefore referred to, that Green had been Rhonda's assailant. In finding that Rhonda had been transported in interstate commerce while she was still alive, the district court relied on the common law presumptions that Rhonda's death occurred where her body was found and that life continued until proven otherwise. The district court also concluded that since people frequented the El Cid complex all night long and police cars patrolled the area, the fatal assault took place in the deserted area in East St. Louis where Rhonda's body was found.

In his appeal Green raises six issues:

■ (1) Green contends that Emmett Ware's testimony that he heard Rhonda say "that little nigger is still bothering me" was inadmissible hearsay because it reflects her subjective conclusion and her personal belief about him. However, Rule 803(3) of the Federal Rules of Evidence provides an exception to the hearsay rule for statements of the declarant's then existing state of mind and intent. These were essential issues at the trial since the kidnapping charge involved transporting Rhonda involuntarily in interstate commerce. The statements attributed to Rhonda indicated that she was nervous and upset and that she was transported by Green without her consent. We find that the probative value of the statements outweighs the prejudice. *See, e.g., United States v. Pheaster*, 544 F.2d 353, 374–80 (9th Cir. 1976), *cert. denied*, 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 546 (1977); *United States v. Calvert*, 523 F.2d 895, 910 (8th Cir. 1975), *cert. denied*, 424 U.S. 911, 96 S.Ct. 1106, 47 L.Ed.2d 314 (1976); *Oberman v. Dun & Bradstreet, Inc.*, 507 F.2d 349, 351–52 (7th Cir. 1974).

■ (2) Green contends that the testimony of the forensic serologist regarding genetic markers should have been excluded because the actual blood stains which were tested were not available to Green for evaluation and he was therefore unable to effectively cross-examine the expert. However, it is clear that the blood stains were not destroyed intentionally, nor is there any showing of bad faith, collusion or culpability on the part of the law enforcement officers. The blood stains were obtained on May 27, 1980. Under proper conditions blood stains remain stable for only two months. Here the blood stains were tested within the two-month period, but the test results only last for an hour after the test is run and, as is usual, photographs were not taken. While this was going on, Green was a fugitive, so there was no way that the government could have had his own expert present. There is no indication that the blood stains were destroyed in order to prevent Green from having access to them. *See United States v. Ortiz*, 603 F.2d 76, 80 (9th Cir. 1979), *cert. denied*, 444 U.S. 1020,

100 S.Ct. 678, 62 L.Ed.2d 652 (1980); *United States v. Sewar*, 468 F.2d 236, 237–38 (9th Cir. 1972), *cert. denied*, 410 U.S. 916, 93 S.Ct. 972, 35 L.Ed.2d 278 (1973). Green's counsel was able to question the expert at length on the correctness and reliability of the procedures which he used and to challenge the veracity of the results obtained. The record satisfies us that Green was not denied his rights of cross-examination and that the testimony was properly admitted. *See Ortiz, supra.*

■ (3) Green contends that the forensic serologist should not have been allowed to testify regarding the frequency of occurrence of the particular genetic markers in the population. Green contends that he was not given adequate notice of this testimony and that the testimony was not reliable. The government furnished Green with all of its reports and test results, including an article written by the expert on the frequency of occurrence of genetic markers in the population, so that he was aware that this type of testimony might be introduced, and we find that it was properly admitted. Green also contends that the testimony was not reliable because the expert relied on a biological statistician to determine an appropriate sample size in studying frequency of occurrence since this was outside of his own area of expertise. However, we find that the expert was not relying on someone else's work, but that he only used it as recommendations in connection with his own statistical studies. Therefore, we find the expert's testimony was reliable.

■ (4) Green contends that the court erred in admitting the out-of-court statements which he had made at different times to various law enforcement officials. We have recently reaffirmed the principle that a conviction must rest on firmer ground than the statements of the accused; that there must be independent evidence that a crime was committed. *United States v. Fearn*, 589 F.2d 1316, 1321–22 (7th Cir. 1978). While a conviction based solely upon the disbelief of the defendant's statements cannot stand, this does not make such disbe-

lief irrelevant. *United States v. Scher,* 476 F.2d 319, 321–22 (7th Cir. 1973). It is apparent that Green's inconsistent statements were an attempt to throw suspicion on others and tended to show his own guilt. Moreover, the detailed nature of these statements, particularly regarding the location in East St. Louis to which he claimed to have been taken by Saffold and Wright, tended to show his own guilt because it demonstrated knowledge of facts which he would be unlikely to know had he not committed the crime. *United States v. Gresham,* 585 F.2d 103, 106 (5th Cir. 1978). We find that Green's statements were sufficiently corroborated and that the district court did not err in admitting them.

▪ (5) Green contends that there was insufficient evidence to show that Rhonda was alive when the interstate transportation occurred or that he committed the crime. We agree with the conclusion of the district court that there was sufficient evidence to show both that Rhonda was alive when she was taken across the state line and that Green was her assailant. Based upon the facts of the case, the district court determined that it was unreasonable to believe that Rhonda was nude in the car while it was at the El Cid complex and that, at most, Rhonda was stunned or knocked unconscious at that time. We find the evidence supports the conclusion of the district court that the fatal assault occurred in East St. Louis, and that Green dragged her body out of the car and then drove her car back to the El Cid parking lot. In finding that Green was Rhonda's assailant, the district court could properly rely upon his statement that Rhonda had stabbed him and the fact that Green's blood was found on Rhonda's shirt and in her car, all of this following the events hereinbefore mentioned. The district court could also rely on Green's statements to law enforcement officials, including his statement that he had gone to the very spot in East St. Louis where Rhonda's body was found.

▪ (6) Finally, Green objects to the application by the district court of the two common law presumptions above referred to: (a) that death occurs where the body is found; and (b) that life continues until it is proven otherwise, for the purpose of determining federal jurisdiction. He points out that if Rhonda died before the crossing of the state line there was no federal crime, and he contends that there was no evidence that Rhonda died in Illinois and therefore the district court was not entitled to apply the common law presumptions. However, we find that the district court properly applied the presumptions and correctly concluded from the evidence that Rhonda's death occurred in Illinois following her transportation in interstate commerce. A careful review of the record satisfies us that Green was guilty as charged, and his conviction is AFFIRMED.