**UNITED STATES of America, Plaintiff,**

v.

**Sami Fayez ABURAHMAH, Defendant.**

**No. CR 92–705 TUC JMR.**

United States District Court,
D. Arizona,
Tucson Division.

July 20, 1993.

Virginia Kelly, Asst. U.S. Atty., Tucson, AZ, for plaintiff.

Harriette P. Levitt, Tucson, AZ, for defendant.

*ORDER*

ROLL, District Judge.

Defendant was convicted by a jury of kidnap for murder of his wife, Emerald Crawford Aburahmah. Defendant Aburahmah has moved for a new trial pursuant to Rule 33, Fed.R.Crim.P., based upon four arguments:

1) The government failed to prove that the victim was alive when she was transported across state lines;

2) Even if the victim was alive when she was transported across state lines, the government failed to prove that she was transported against her will;

3) The district court erroneously admitted evidence of uncharged misconduct, including defendant's possession of knives and firearms and his skinning of rabbits; and,

4) Juror misconduct tainted the verdict.

The Court has considered both the memoranda of points and authorities submitted by the parties as well as the oral arguments of counsel made at the hearing on the motion.

For the reasons set forth below, the motion for a new trial is denied.

### FACTS

Viewing the evidence in the light most favorable to the government, *United States v. Rush,* 749 F.2d 1369, 1372 (9th Cir.1984), the facts are as follows. Defendant is from the Middle East. He was in the United States on a student program. On January 13, 1982, defendant and Emerald Crawford were married. The marriage was a stormy one and was strongly disapproved of by Emerald's family. During the summer of 1982, the defendant went to New Jersey for 2½ months. Emerald began to see other men. When the defendant returned to Tucson from New Jersey in September, Emerald was dating an airman nicknamed "Okie," whose true name is Rick Young.

On one occasion, she needed medical treatment as a result of the defendant twisting her wrist. At another time, the defendant wouldn't let Emerald out of his van. Emerald told a friend that she was afraid that the defendant would kill her. Emerald confided to another friend that the defendant told Emerald that if he couldn't have her, then no one could.

On Oct. 1, 1982, the defendant went to the Sundance Bar on 22nd Street in Tucson, Arizona, and encountered Emerald, who was with Okie, Sandra Sconza and Chris Sconza. Sandra Sconza joined the verbal altercation and told the defendant to leave Emerald alone. A bouncer removed the defendant from the bar. The Sconzas, Emerald, and Okie left the bar shortly thereafter. Sandy Sconza testified that the defendant began to follow the foursome and that a high speed chase ensued, during which the defendant crossed the divider and attempted to overtake them by proceeding in the face of oncoming traffic.[1] They escaped the defendant by going upon Davis Monathon Air Force

Base (DMAFB), which was limited access property.

On October 2, 1982, the Sconzas, Emerald, and Okie went to Mt. Lemmon. Okie gave Emerald a souvenir half tee-shirt from Lake Tahoe. At the end of the day, Okie returned to DMAFB and the Sconzas and Emerald went to Sandy Sconza's house, where they spent the night. Emerald had no change of clothes.

On October 3, 1982, the Sconzas heard an automobile horn. Outside were the defendant and another individual, both of whom had apparently arrived in the defendant's van. Although the Sconzas urged Emerald not to meet with the defendant, she insisted. Chris Sconza heard Emerald tell the defendant that she wanted a divorce. The Sconzas observed Emerald and the defendant argue, then saw the defendant pull Emerald by the arm into the van.[2] They did not report this to anyone. This was the last time any witness saw Emerald Crawford alive.

On October 4, 1982, a rock hunter came upon a smoldering body on a desert road near Deming, New Mexico. The woman's face and torso were badly burned, she was wearing a shirt and pantyhose, and she wore a wedding ring. Perhaps most importantly, her feet were intact. An autopsy performed on October 6, 1982, revealed that the woman died from having her throat slit by a very sharp instrument, such as a knife. The body was then set on fire. The fourth and fifth toes of her left foot had a very unique formation. The muscle alcohol level of the woman was .06, which could have resulted from decomposition. Acid phosphatase was present in her vaginal vault, indicative of recent sexual intercourse. She was buried as a "Jane Doe."

The remote location off of Interstate 10 where the body was found had one set of tire tracks, and these tracks were made by a wide track vehicle, such as a van. In addition, one of the tires made an imprint consist-

---

**1.** This account was contradicted by Okie, who testified that he was driving that night and remembered no chase. Okie's account may have been disregarded by the jury as a result of evidence of Okie's intoxication on the evening of the alleged chase.

**2.** When this matter proceeded to trial, Chris and Sandy Sconza were divorced.

ing of six parallel lines. In October of 1982, the defendant owned a van and at least one of the tires had six parallel lines on the tread.

New Mexico motor vehicle records reflected that on October 6, 1982, the defendant and a companion named Hisham Lulu attempted to obtain driver's licenses in New Mexico. Ahmed Aburahmah testified for the defense that he, the defendant, Lulu, and a fourth man, all travelled to New Mexico to obtain driver's licenses.[3]

During October, the defendant told Emerald's friend, Mary Alsoqui, that if anyone asked Alsoqui where the defendant had been in the last two days, she should say that the defendant had been in town. The defendant never asked Alsoqui to help find Emerald.

In November, 1982, the defendant met a young woman named Lynn. In December of 1982 he began to date her frequently. In the spring of 1983, the defendant spoke with Lynn by phone from Alabama and purported to go through a telephonic marriage ceremony.[4] Defendant never told this woman about his wife's disappearance or the fact that he was apparently still married. She testified he always had a knife with him, either on his belt or in his van. She also testified that he was proficient at skinning rabbits with a knife.

In 1989, Emerald's step-mother, Delfina Crawford, learned that Emerald was not with the defendant. She then went to the Tucson Police Department to report the possibility of foul play. The case was assigned to Detective Ruben Nunez. Det. Nunez contacted a number of Emerald's friends and relatives in an attempt to gain information about Emerald and to reconstruct the time frame surrounding her disappearance. On October 11, 1989, as part of his investigation, Detective Nunez conducted a telephone interview of the defendant. The defendant denied knowing of Emerald's whereabouts. He stated that he had attempted to file a missing person report with the Tucson Police

Department and that he and Mary Alsoqui had looked for the victim. The defendant stated that he last saw her in 1982. Detective Nunez could locate no missing person report filed by the defendant. Nunez then circulated bulletins describing the victim and the date of her disappearance. The bulletins disseminated to western law enforcement agencies included a description of the victim's peculiar toe formation.

In November 1991, a New Mexico official saw one of Detective Nunez's bulletins and recalled that the 1982 Jane Doe found near Deming had an abnormal toe formation. He contacted Detective Nunez and Emerald Crawford was identified as the 1982 Jane Doe.

On November 12, 1991, Nunez reinterviewed the defendant, this time in person. The defendant expressed shock at the victim's death. During a tape-recorded interview, the defendant denied involvement in Emerald's murder. He stated he had come home one day only to discover that all of her belongings were gone. He said that he tried to locate Emerald after she disappeared and never suspected her of infidelity. The defendant claimed that the marriage had been free of arguments or fights. He reiterated that he had reported the victim's disappearance to the police. He said that the phone wedding with Lynn had been arranged because she kept telling him how much she wanted to marry him. He stated that in his native land, when a wife was guilty of adultery, she was subject to being stoned to death. He said that adultery was proven by the testimony of four witnesses. The defendant pointed out that an adulterous wife's death sentence, however, was carried out by the government, not the husband.

In 1992, the defendant was indicted by a federal grand jury for kidnapping and for murder. A jury found the defendant guilty as charged.

---

**3.** Ahmed Aburahmah, the only defense witness, testified that the New Mexico test was easier than that administered by Arizona officials.

**4.** At the time of this telephone call, the defendant was in jail in Alabama in connection with mur-

der and attempted murder charges involving events unrelated to the present case. Evidence of the Alabama incarceration and the surrounding circumstances were not presented to the jury.

## ANALYSIS

### Standard for Deciding Rule 33 Motions

Rule 33 provides that the district court may grant a new trial to defendant "if required in the interest of justice." The decision to grant a new trial lies within the discretion of the district court. *U.S. v. Rush,* 749 F.2d 1369, 1371 (9th Cir.1984). However, a motion for a new trial "should be granted 'only in exceptional circumstances in which the evidence preponderates heavily against the verdict.' " *United States v. Pimentel,* 654 F.2d 538, 545 (9th Cir.1981) (quoting 2 Wright, *Federal Practice and Procedure,* Criminal § 553 at 487 (1969)).

A motion for new trial based upon insufficient evidence must be denied if, "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis supplied). If the evidence conflicts, then the conflict is to be "resolved in favor of the verdict." *United States v. Ramos,* 558 F.2d 545, 546 (9th Cir.1977).

### Sufficiency of Evidence

#### A. Proof Victim Was Transported in Interstate Commerce While Alive

■ Defense counsel argues that the government failed to prove that the victim was alive when she left Arizona and entered New Mexico. Defense counsel contends that if the victim was murdered in Arizona, the federal crime of kidnap for murder did not occur when her body was transported from Arizona to New Mexico.

The government relies upon the statutory presumption that a kidnap victim not released within twenty-four hours was transported in interstate commerce. 18 U.S.C. § 1201(b). The government also argues that because of the vast desert area between Tucson and the Arizona/New Mexico border, if the defendant had intended to dispose of the victim's body in a remote desert area, it was clearly unnecessary to drive to Deming, New Mexico.

The government also relies upon *United States v. Green,* 680 F.2d 520, 524 (7th Cir.) *cert. denied,* 459 U.S. 1072, 103 S.Ct. 493, 74 L.Ed.2d 635 (1982). There, a seventeen year old female was last seen alive in Charlack, Missouri. Her body was found in a deserted area in East St. Louis, Illinois, across the river from Charlack. The Seventh Circuit affirmed the defendant's conviction of kidnap for murder, notwithstanding the defendant's assertion that insufficient evidence existed that the victim was alive when she was transported to East St. Louis. Even though the government's proof established that witnesses observed and heard the victim being assaulted in Charlack the last time anyone saw her alive, the Seventh Circuit held that the district judge properly applied two common law presumptions: "(a) that death occurs where the body is found; and (b) that life continues until it is proven otherwise, for the purpose of determining federal jurisdiction." 680 F.2d at 524.

In light of the evidence presented and the applicable common law presumptions, sufficient evidence exists that the victim was transported in interstate commerce while alive.

#### B. Proof That Victim Was Transported Against Her Will

Defendant contends that the government failed to prove that the victim was transported in interstate commerce without her consent. Again, the evidence must be viewed in the light most favorable to sustaining the verdict. *Rush,* 749 F.2d at 1372.

Here, the evidence included proof that the victim was forced into the defendant's van, she was never seen alive again, she took none of her belongings with her, and she never told anyone that she planned on leaving Tucson. The victim had stated her intention of divorcing her husband and she feared that her husband was going to murder her. The defendant owned weapons available for use in abducting the victim and the victim's fatal injuries were consistent with one such weapon. The victim's body was found in an adjacent state the day after the defendant forced her into his van and physical evidence at the site where the body was found demonstrated that the defendant's van was used to take the

victim to that location. Motor vehicle records established that the defendant was in New Mexico the day after the body was found. The defendant gave inconsistent and false statements regarding his relationship with the victim and his actions after she "disappeared." On these facts, the jury could reasonably have concluded that the defendant transported the victim against her will with the intent to murder her. *Cf. State v. Hinkle,* 26 Ariz.App. 561, 564–65, 550 P.2d 115, 118–119 (1976).

### Uncharged Misconduct Evidence

■ The defendant argues that a new trial should be granted because evidence of other acts of the defendant were admitted at trial. Specifically, the defendant argues that the trial court erroneously admitted evidence of the defendant's possession of firearms and knives and the fact that the defendant shot and skinned rabbits.

The government offered evidence of those firearms known by the victim to be possessed by the defendant in order to prove why the victim may have accompanied the defendant against her will. The government introduced evidence of the defendant's possession of knives because a knife was used to slit the victim's throat and was the cause of the victim's death. Evidence of the fact that the defendant shot and skinned rabbits was offered by the government to show the defendant's dexterity with a hunting knife. None of these acts were admitted merely to prove bad character. *Compare McKinney v. Rees,* 993 F.2d 1378 (9th Cir.1993). This evidence showed that the defendant had the means to carry out the kidnapping and murder of the victim. Furthermore, the district court gave the jury cautionary instructions and, in its closing instructions, utilized defendant's jury instruction on uncharged acts.[5] The admis-

sion of this evidence does not require the granting of a new trial.

### Juror Misconduct—Extrinsic Information

■ The jury was repeatedly instructed to avoid reading, hearing, or watching any media reports regarding this case. This admonition was given in opening instructions and was repeated at various recesses during the trial.

After the verdict was announced in open court, the district judge, following a routine practice, went to the jury room to thank the jurors for their service, answer any non-specific procedural questions they might have had, and solicit any suggestions for future jurors' comfort. The judge immediately noticed a copy of that day's *Arizona Daily Star,* a local newspaper, on the table. The judge promptly requested that all of the jurors remain in the jury room. Counsel and the defendant were still in the courtroom. The district court then conducted a hearing at which each juror was individually questioned as to whether they had read an article about the trial which had appeared in that morning's newspaper. Counsel were afforded the opportunity to examine each juror.

The hearing disclosed that the jury voted to convict the defendant, the foreperson signed the verdict form, and the bailiff was informed that the jury had reached a verdict. Only then, before the verdict was announced in court, did one juror begin to read the newspaper. That juror then informed the other jurors that the paper carried an article on the trial. Although the juror proceeded to read the article, the juror did not tell the other jurors what the article said. The jury had no further discussions about the case after the verdict was signed. The jury then entered the courtroom, announced its verdict,

---

5. The instruction submitted by defense counsel was cited as Pattern Criminal Jury Instruction of the District Judges Association of the Sixth Circuit, No. 7.13 (1991). The instruction given to the jury stated:

    1. You have heard testimony that the Defendant committed some acts other than the ones charged in the indictment.

    2. You cannot consider this testimony as evidence that the defendant committed a crime

other than that for which he is on trial for now. Instead, you can only consider it in deciding whether he is guilty of kidnapping.

    3. Remember that the defendant is on trial here only for kidnapping, not for the other acts. Do not return a guilty verdict unless the government proves the crime charged beyond a reasonable doubt.

and was polled. No juror deviated from this account.

 A defendant must initially show that the jury had extrinsic evidence and that the evidence could have affected the verdict. The burden then shifts to the government to show that any such exposure was harmless beyond a reasonable doubt. *United States v. Caro–Quintero,* 769 F.Supp. 1564, 1574–75 (C.D.Cal.1991). Here, the district court took immediate steps to ascertain the precise breadth of the jury's exposure to extrinsic evidence. The article read by the juror contained a reference to the defendant's Alabama murder conviction. However, the article was not read by any of the jurors until after the verdict form had been signed and all that remained was for the jurors to announce their verdict in open court.

Although it could be suggested that the possibility existed that one or more of the jurors would disavow the verdict during polling, the Ninth Circuit has pointed out that polling is conducted primarily "to discover possible coercion." *United States v. McClintock,* 748 F.2d 1278, 1293 (9th Cir.1984), *cert. denied,* 474 U.S. 822, 106 S.Ct. 75, 88 L.Ed.2d 61 (1985).

In *United States v. Shepherd,* 576 F.2d 719 (7th Cir.), *cert. denied,* 439 U.S. 852, 99 S.Ct. 158, 58 L.Ed.2d 155 (1978), verdicts were returned in open court involving four defendants, one of whom was acquitted. Before the jury was polled, the district judge called the acquitted defendant to the bench and, in the presence of the unpolled jury, administered a tongue-lashing which included the observation that "[m]any a jury would have found you guilty ..." 576 F.2d at 722. The judge then polled the jurors as to the verdicts rendered against the co-defendants. One of the convicted co-defendants argued on appeal that the judge's comments prior to polling had tainted the verdicts. The Seventh Circuit pointed out that the judge's comments were not made until after deliberations had been completed. 576 F.2d at 724. The Seventh Circuit also stated that although it is possible that a juror could change his or her mind between the end of deliberations and the time of polling, "(e)xperience teaches ... that the likelihood of such a change of mind is remote." 576 F.2d at 724–25. The court explained:

> The purpose of affording a right to have the jury polled is not to invite each juror to reconsider his decision, but to permit an inquiry as to whether the verdict is in truth unanimous.

576 F.2d at 725. Beyond a reasonable doubt, the juror's reading of the newspaper article in this case was harmless.

## CONCLUSION

IT IS ORDERED that the defendant's motion for a new trial is **DENIED**.